THE FARNDALE COMPANY, LLC, AND VAL PARTICIPATIONS, S.A., PLAINTIFFS v. FOLCO GIBELLINI AND ACCUMA, S.p.A., DEFENDANTS

No. COA05-451

(Filed 21 February 2006)

## 1. Corporations— fiduciary relationship—majority shareholder to minority shareholder—responsibility for issuance of stock

The trial court did not err by denying defendants' motion for directed verdict on plaintiffs' claim of breach of fiduciary duties owed by majority shareholders to minority shareholders even though defendants contend plaintiffs did not produce sufficient evidence that defendants were responsible for an August 1999 issuance of stock, because: (1) there was evidence presented at trial that a shareholder meeting was held in August 1999 for the purpose of voting to amend the pertinent company's articles of incorporation to allow the stock issuance, and that plaintiffs did not vote in favor of this amendment; and (2) there was sufficient

evidence that defendants, as majority shareholders in a closely held corporation, voted to approve the amendment allowing issuance of the stock, and were generally responsible for the company's recapitalization.

2. **Corporations— fiduciary relationship—majority shareholder to minority shareholder—recapitalization—breach of fiduciary duty—burden of proof**

The trial court did not err by denying defendants' motion for directed verdict on plaintiffs' claim of breach of fiduciary duties owed by majority shareholders to minority shareholders even though defendants contend plaintiffs did not produce any evidence that the recapitalization of the pertinent company was a breach of their fiduciary duty to plaintiffs, because: (1) once a minority shareholder challenges the fairness of the actions taken by the majority, the burden shifts to the majority to establish that its actions were in all respects inherently fair to the minority and undertaken in good faith; and (2) defendants' liability is not based on a finding that the stock issuance was a per se breach of fiduciary duty, but instead their liability is based on the jury's finding that defendants improperly took advantage of their majority status and that the stock issuance was not done in good faith.

3. **Corporations— fiduciary relationship—majority shareholder to minority shareholder—recapitalization—good faith**

The trial court did not err by denying defendants' motion for directed verdict on plaintiffs' claim of breach of fiduciary duties owed by majority shareholders to minority shareholders on the issue of defendants' good faith in issuing the block of shares in August 1999, because there was sufficient evidence of circumstances and context that would allow the jury to find that: (1) the shares were issued at a price significantly below their true value, increasing the total number of shares required to comprise a $6,000,000 block of stock; (2) defendants ignored information that might have justified a higher valuation of the pertinent company; (3) defendants were aware that, since the parties' professional and personal relationships had soured, it was unlikely plaintiffs would choose to invest further in the company; and (4) defendants knew that, assuming plaintiffs did not exercise their preemptive rights, the issuance of $6,000,000 worth of stock at the depressed price per share would give them almost total ownership of the company.

FARNDALE CO. v. GIBELLINI

[176 N.C. App. 60 (2006)]

Appeal by defendants from judgment entered 12 October 2004 by Judge Michael E. Beale in Iredell County Superior Court. Heard in the Court of Appeals 17 November 2005.

*James, McElroy, & Diehl, P.A., by Preston O. Odom, III, Richard B. Fennell, and Gary S. Hemric, for plaintiffs-appellees.*

*Moore & Van Allen, PLLC, by Jeffrey J. Davis, Valecia M. McDowell and Amy K. Lamoureux, for defendants-appellants.*

LEVINSON, Judge.

Defendants appeal from judgment entered against them for breach of their fiduciary duty to plaintiffs. We affirm.

The parties have a history of commercial and personal relationships for over fifty years, which is summarized as follows: Accuma, S.p.A. ("Accuma Italy") is an Italian corporation, founded in the early 1960's, that makes and sells battery parts. Accuma Italy's founders included defendant Folco Gibellini (Gibellini), who owns a controlling interest in the firm, and Sergio Pezzotti, who owns plaintiff VAL Participations (VAL). As Accuma Italy prospered, it expanded to Luxembourg, the United Kingdom, and then to the United States, where Accuma Italy founded defendant Accuma Corporation (Accuma) in Statesville, North Carolina.

Accuma is a closely held North Carolina corporation that also manufactures and sells battery parts. After its founding in the mid 1980's, plaintiffs VAL and Farndale Company, LLC ("Farndale") loaned the company more than 2.8 million dollars. Farndale is owned by Jim Brennan. In the late 1990's, relationships among the parties deteriorated, and in 1998 plaintiffs demanded repayment of their loans to Accuma. When the parties could not agree on the repayment, plaintiffs filed suit to collect the debt owed by Accuma. At this juncture, Accuma had issued 100,000 shares, and ownership of Accuma was divided as follows:

Defendant Gibellini: 45%, or 45,000 shares. Defendant Accuma Italy: 10%, or 10,000 shares. Plaintiff VAL: 36%, or 36,000 shares. Plaintiff Farndale: 9%, or 9,000 shares.

After plaintiffs demanded repayment of their loans, Accuma investigated the possibility of issuing additional stock to raise money. To this end, Accuma obtained an outside appraisal of the company's financial status as of 31 December 1998. Based on this appraisal,

FARNDALE CO. v. GIBELLINI

[176 N.C. App. 60 (2006)]

Accuma's board of directors in August 1999 proposed issuance of 4,451,035 shares at $1.348 per share, for a total recapitalization of six million dollars. When the shares were issued, all shareholders had an opportunity to purchase an amount of new stock proportional to their respective percent of ownership in Accuma. However, plaintiffs chose not to purchase any of the newly issued shares. Defendants bought all the shares issued in August 1999, after which defendants collectively owned more than ninety-nine (99) percent of Accuma's shares, while plaintiffs owned less than one (1) percent.

On 19 June 2002, plaintiffs filed suit against Gibellini, Accuma, Francesca Invernizzi, Paolo Invernizzi, and Accuma Italy. Plaintiffs sought damages for civil conspiracy, failure to comply with N.C. Gen. Stat. § 55-16-01 et seq., and breach of fiduciary duty. Plaintiffs' complaint alleged that defendants were responsible for the August 1999 issuance of shares, and that the issuance was undertaken with the purpose of squeezing plaintiffs out of the company, and thus a violation of defendants' fiduciary duty to plaintiffs. The case was tried before an Iredell County jury during the 13 September 2004 term of court. Prior to trial, all claims against Paolo Invernizzi were dismissed.

The plaintiffs' trial evidence included, in pertinent part, the following: Jim Brennan testified that he had been Accuma's president from the company's founding in 1984 until he was fired in 1998. Brennan described the growing conflict and tension among the parties in the late 1990's. As owner of Farndale, Brennan had a 9% ownership interest in Accuma's stock before the August 1999 issuance of shares. In 1997, Brennan offered to buy Accuma for eight to ten million dollars. He testified that, in his opinion, the new stock was "remarkably undervalued". Brennan did not purchase any of the shares because he disagreed with the valuation, did not want to put more money into a company that he thought was mismanaged, and did not want to invest in Accuma as a minority shareholder.

Chuck Vance testified that he was a financial analyst who had been hired by Accuma to perform a financial valuation of the company. He was instructed by Accuma to determine the fair market value of the company as of 31 December 1998, in order to calculate the appropriate price per share and the number of shares that would constitute a $5,000,000 block of stock. He was later asked to recalculate the stock issuance based on a $5,500,000 or $6,000,000 block of shares. Ultimately, $6,000,000 worth of shares were issued. Vance submitted a report in 1999, indicating that Accuma was worth

$600,000. He was not asked to revise this valuation, even after Accuma experienced an upturn in profit for the first six months of 1999.

Vance also testified about certain notes he took during the valuation process, explaining that he was asked to calculate the dilutive effect on minority shareholder ownership under various scenarios. These included, *inter alia*: a notation that one might "pay too much for an ownership interest"; a notation referencing an "iterative process of trial and error to get point of ownership"; a notation that "the existing shareholders will maintain a minority interest in the company so you cannot get 100% unless they sell to you"; and the notations "want high 90%," "no more than $6,000,000," and "5.6 to 6.0 scenarios."

Michael Paschal, who was qualified as an expert in business valuation and capitalization, testified that he had been hired by plaintiffs to review Vance's valuation of Accuma. Paschal was critical of Vance's valuation report for several reasons, including: Vance's apparent reliance on mutually inconsistent valuation methods, one of which calculated the company's value at 5.6 million and the other at $600,000; the fact that Vance's projections and assumptions were neither supported nor explained in his report; and Vance's failure to consider offers to purchase Accuma. Paschal also testified that the reduction of plaintiffs' percentage ownership to less than one percent, upon defendants' purchase of 4,451,035 shares, was mathematically dependent on Vance's valuation of Accuma at $600,000 rather than $5,600,000. This testimony related to one of plaintiffs' central theories at trial, that defendants selected the number of undervalued shares the company would offer for the purpose of reducing plaintiffs' percentage ownership in the company, and a corresponding increase in defendants' ownership interest, in the event plaintiffs did not exercise their preemptive rights.

Sergio Pezzotti testified that he was born in Italy and was seventy-three years old. In 1952 he began working at the Gibellini plant in Milano, Italy. In the early 1960's, he was invited to join Gibellini and another man in founding Accuma Italy. Pezzotti testified to Accuma Italy's growth, success, and expansion to North Carolina, where it opened Accuma. In 1997, Accuma owed almost three million dollars to plaintiffs. Pezzotti testified further that the relationships among the parties deteriorated in the late 1990's, and described instances wherein Pezzotti believed defendants betrayed his trust or misman-

FARNDALE CO. v. GIBELLINI

[176 N.C. App. 60 (2006)]

aged Accuma. Pezzotti did not buy any of the stock issued in 1999 because he no longer trusted the defendants. However, he believed that Accuma was worth at least five and a half million dollars in 1999, and offered to buy the company from defendants.

Plaintiffs also presented generally corroborative testimony from other witnesses. Ernie Riegel testified that his law firm represented Accuma during its recapitalization. Riegel confirmed that Accuma had issued $6,000,000 in shares after shareholder approval was obtained at a special meeting. Matthew Gillespie, Accuma's chief financial officer from January 1999 to April 2000, testified that the company improved its financial situation during the first six months of 1999. He also conceded that he had calculated the dilutive effect on minority shareholder ownership of various recapitalization alternatives. Robert Faulkner testified that he was employed in the field of business valuation. After reviewing Vance's valuation, Faulkner concluded that Vance valued Accuma too low, and used data that was outdated by the time he submitted his report.

At the close of plaintiffs' evidence, defendants moved for a directed verdict on all claims. The trial court dismissed all of the claims brought against Accuma and Francesca Invernizzi, and dismissed plaintiffs' claims of civil conspiracy and failure to comply with statutory requirements. The court denied defendants' motion for directed verdict on the claims against Gibellini and Accuma Italy for breach of fiduciary duty.

Defendants presented the testimony of J. Robert Philpott, an investment banker and expert in business valuation. Philpott's testimony tended to support Vance's conclusion that on 31 December 1998 Accuma was worth $600,000.

At the close of all the evidence, defendants renewed their directed verdict motion, which the trial court denied. Four questions were submitted to the jury, and answered as follows:

1. Did the defendants . . . take improper advantage of their power as controlling shareholders in Accuma corporation by causing the issuance of stock in Accuma Corporation in August 1999 at a price of six million dollars?

Answer: Yes.

2. Did the defendants . . . act in good faith and with care and diligence in exercising their power as controlling shareholders of Accuma Corporation?

Answer: No.

3. What amount is the plaintiff, Farndale Co., LLC, entitled to recover for damages from the defendants?

Answer: $360,000.

4. What amount is the plaintiff, VAL Participations, S.A., entitled to recover for damages from the defendants?

Answer: $1,440,000.

Upon this verdict, the trial court entered judgment in favor of plaintiffs, from which defendants appeal.

### Standard of Review

Defendants appeal the denial of their motion for directed verdict on plaintiffs' claim of breach of fiduciary duties.

"The purpose of a motion for directed verdict is 'to test the legal sufficiency of the evidence to take the case to the jury and to support a verdict for plaintiffs[.]' The evidence should be considered in the light most favorable to the nonmovant, and the nonmovant is to be given the benefit of all reasonable inferences from the evidence. 'If there is more than a scintilla of evidence supporting each element of the nonmovant's case, the motion for directed verdict should be denied.' "

*Whisnant v. Herrera*, 166 N.C. App. 719, 722, 603 S.E.2d 847, 849-50 (2004) (quoting *Wallace v. Evans*, 60 N.C. App. 145, 146, 298 S.E.2d 193, 194 (1982), and *Snead v. Holloman*, 101 N.C. App. 462, 464, 400 S.E.2d 91, 92 (1991)). "In deciding whether to grant or deny a motion for directed verdict, 'the trial court must accept the non-movant's evidence as true and view all the evidence in the light most favorable to him.' " *Boggess v. Spencer*, 173 N.C. App. 614, 618, 620 S.E.2d 10, 13 (2005) (quoting *Williamson v. Liptzin*, 141 N.C. App. 1, 9-10, 539 S.E.2d 313, 318-19 (2000)), *disc. review denied*, 360 N.C. 288, —— S.E.2d —— (2005).

On appeal, "[t]he standard of review of directed verdict is whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the

FARNDALE CO. v. GIBELLINI

[176 N.C. App. 60 (2006)]

jury." *Di Frega v. Pugliese*, 164 N.C. App. 499, 505, 596 S.E.2d 456, 461 (2004) (citing *Kelly v. Harvester Co.*, 278 N.C. 153, 158, 179 S.E.2d 396, 397 (1971)). Moreover, "in reviewing the trial court's decision to grant a directed verdict, this Court's scope of review is limited to those grounds asserted by the moving party at the trial level." *Freese v. Smith*, 110 N.C. App. 28, 34, 428 S.E.2d 841, 844-45 (1993) (citing *Southern Bell Tel. & Tel. Co. v. West*, 100 N.C. App. 668, 397 S.E.2d 765 (1990)).

In the instant case, the trial court denied a motion for directed verdict on claims of breach of the fiduciary duty owed by a majority shareholder to a minority shareholder.

> For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties. Such a relationship has been broadly defined by this Court as one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . , [and] it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.

*Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707-08 (2001) (internal quotation marks omitted).

"In North Carolina, it is well established that a controlling shareholder owes a fiduciary duty to minority shareholders." *Freese*, 110 N.C. App. at 37, 428 S.E.2d at 847 (citing *Gaines v. Manufacturing Co.*, 234 N.C. 340, 67 S.E.2d 350 (1951)). "A majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests." *United States v. Byrum*, 408 U.S. 125, 137, 33 L. Ed. 2d 238, 248 (1972). As to "good faith":

> Black's Law Dictionary defines 'good faith' as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." Whether a party has acted in good faith is a question of fact for the trier of fact, but the standard by which the party's conduct is to be measured is one of law. In making the determination as to whether a party's actions constitute a lack of

good faith, the circumstances and context in which the party acted must be considered.

*Bledsole v. Johnson*, 357 N.C. 133, 138, 579 S.E.2d 379, 382 (2003) (quoting Black's Law Dictionary 701 (7th ed. 1999), and citing *Embree Construction Group v. Rafcor, Inc.*, 330 N.C. 487, 499, 411 S.E.2d 916, 925 (1992)). Review of a ruling on this issue may, of necessity, look beyond the facial legality of a defendant's actions: "Where fiduciary duties arising from management control are implicated, judicial scrutiny may extend to the purpose for which an otherwise lawful course was undertaken and the result achieved." *Farahpour v. DCX, Inc.*, 635 A.2d 894, 901 (Del. 1994).

I.

**[1]** Defendants argue first that the trial court erred by denying their motion for directed verdict, on the grounds that plaintiffs did not produce sufficient evidence that defendants were responsible for the August 1999 issuance of stock. We disagree.

"This Court has held that a '[b]reach of fiduciary duty is a species of negligence or professional malpractice.'" *Carlisle v. Keith*, 169 N.C. App. 674, 682, 614 S.E.2d 542, 548 (2005) (quoting *Heath v. Craighill, Rendleman, Ingle & Blythe, P.A.*, 97 N.C. App. 236, 244, 388 S.E.2d 178, 183 (1990)). Consequently, "these claims require[] proof of an injury proximately caused by the breach of duty." *Jay Group, Ltd. v. Glasgow*, 139 N.C. App. 595, 601, 534 S.E.2d 233, 237 (2000). Thus, in the factual context of this case, plaintiffs were required to produce evidence that (1) defendants owed them a fiduciary duty of care; (2) defendants' August 1999 issuance of stock was a violation of their fiduciary duty; and (3) this breach of duty was a proximate cause of injury to plaintiffs.

On appeal, defendants purport to challenge the element of proximate cause. However, defendants do not address the causal link between the August 1999 stock issuance and plaintiffs' injuries. Instead, they argue that plaintiffs failed to produce any evidence that defendants were responsible for, or "caused", the issuance of stock in August 1999. We disagree.

Defendants do not dispute that Accuma is a closely held corporation, that they are Accuma's majority shareholders, or that majority shareholders owe a fiduciary duty to minority shareholders. They also concede that the August 1999 issuance of stock required shareholder approval. Further, there was evidence at trial that would sup-

port findings that (1) a shareholder meeting was held in August 1999 for the purpose of voting to amend Accuma's Articles of Incorporation to allow the stock issuance, and (2) plaintiffs did not vote in favor of this amendment. We conclude that this constitutes more than a scintilla of evidence that the defendants, by voting to approve the amendment, were responsible for issuance of the shares. Accordingly, the trial court did not err by failing to grant directed verdict on this basis.

Defendants nevertheless argue that, inasmuch as Accuma's Board of Directors set the price per share and took the final vote to issue the block of stock, the Board is solely responsible for issuance of the stock. However:

> The holders of the majority of the stock of a corporation have the power, by the election of directors and by the vote of their stock, to do everything that the corporation can do. Their power to . . . direct the action of the corporation places them in its shoes and constitutes them the . . . trustees for the holders of the minority of the stock. They draw to themselves and use all the powers of the corporation[.]

*Gaines*, 234 N.C. at 344, 67 S.E.2d at 353 (internal quotation marks omitted). We conclude that there was sufficient evidence that defendants, as majority shareholders in a closely held corporation, voted to approve the amendment allowing issuance of the stock, and were generally responsible for Accuma's recapitalization. This assignment of error is overruled.

## II.

[2] Defendants next argue that, even assuming defendants were responsible for the August 1999 issuance of stock, plaintiffs failed to produce any evidence that the recapitalization was a breach of their fiduciary duty to plaintiffs. We disagree.

Regarding the fiduciary duty owed by a majority shareholder as explained by our Supreme Court:

> " '[t]he devolution of unlimited power imposes on holders of the majority of the stock a correlative duty, the duty of a fiduciary or agent, to the holders of the minority of the stock, who can act only through them—the duty to exercise good faith, care, and diligence . . . [and] to protect the interests of the holders of the minority of the stock[.]' "

*Loy v. Lorm Corp.*, 52 N.C. App. 428, 432, 278 S.E.2d 897, 901 (1981) (quoting *Gaines*, 234 N.C. at 344-45, 67 S.E.2d at 353).

Preliminarily, we observe that defendants' argument, that plaintiffs failed to prove that defendants did not act in good faith, mischaracterizes the burden of proof on this issue. It is "well established in North Carolina . . . that once a minority shareholder challenges the fairness of the actions taken by the majority, the burden shifts to the majority to establish that its actions were in all respects inherently fair to the minority and undertaken in good faith." *Loy*, 52 N.C. App. at 433, 278 S.E.2d at 901.

We also note that defendants argue several times that "the stock issuance was not objectionable *per se*." However, defendants' liability is not based on a finding that the stock issuance was a *per se* breach of fiduciary duty. Rather, their liability is based on the jury's finding that defendants improperly took advantage of their majority status, and that the stock issuance was not done in good faith.

[3] We next consider whether the trial court erred by failing to grant a directed verdict in favor of defendants on the issue of their good faith in issuing the block of shares in August 1999. Defendants note the presence of evidence that Accuma needed money in 1999; that defendants obtained an outside valuation upon which they were legally entitled to rely; and that they complied with relevant statutory requirements regarding preemptive rights. On this basis, defendants argue that "all of the evidence in the record establishes that the decision to issue the shares was a sound one made in good faith after the exercise of diligent examination." We disagree.

As discussed above, in determining if a majority shareholder's actions evince a lack of good faith, "the circumstances and context in which the party acted must be considered." *Bledsole*, 357 N.C. at 138, 579 S.E.2d at 382. In the instant case, the relevant circumstances include evidence that:

1. Accuma fired Brennan, Farndale's owner.

2. Pezzotti, VAL's owner, was upset by defendants' failure to repay his loan, the firing of Brennan, and other actions by defendants.

3. Plaintiffs filed a lawsuit against defendants to obtain repayment of their loan.

**FARNDALE CO. v. GIBELLINI**

[176 N.C. App. 60 (2006)]

4. Brennan and Pezzotti each expressed willingness to purchase Accuma for over $5,000,000.

5. The 31 December 1998 valuation was not revised despite an upturn in Accuma's financial situation in 1999.

6. Before the stock issuance, plaintiffs wrote to defendants, expressing objections and asserting that the stock was undervalued.

7. Certain of Vance's notes indicated he was asked to calculate the dilutive effect of different recapitalization scenarios.

8. Gillespie acknowledged that he calculated the dilutive effect of the stock issuance, assuming plaintiffs would not exercise their preemptive rights.

We conclude that there was sufficient evidence of "circumstances and context" that would allow the jury to find that: (1) the shares were issued at a price significantly below their true value, increasing the total number of shares required to comprise a $6,000,000 block of stock; (2) defendants ignored information that might have justified a higher valuation of Accuma; (3) defendants were aware that, because the parties' professional and personal relationships had soured, it was unlikely plaintiffs would choose to invest further in Accuma; and (4) defendants knew that, assuming plaintiffs did not exercise their preemptive rights, the issuance of $6,000,000 worth of stock at the depressed price per share would give them almost total ownership of Accuma. These findings would, in turn, support the conclusion that defendants acted to further their own interests at the expense of the interests of the minority shareholders, and thus acted in violation of their duty of good faith towards plaintiffs and their corresponding fiduciary duties. Accordingly, the trial court did not err by denying defendants' motion for a directed verdict.

We have considered defendants' other arguments and conclude they are without merit. The judgment of the trial court is

Affirmed.

Judges HUDSON and TYSON concur.