Veer Right Mgmt. Grp., Inc. v. Czarnowski Display Serv., Inc., 2018 NCBC 6.

STATE OF NORTH CAROLINA

WILSON COUNTY

VEER RIGHT MANAGEMENT
GROUP, INC.,

        Plaintiff,

v.

CZARNOWSKI DISPLAY SERVICE,
INC. and TIMOTHY JENKINS,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 1038

**ORDER AND OPINION ON
DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT**

1.     Each year, the United States Postal Service ("Postal Service") attends tradeshows across the country to promote its products. The Postal Service outsources the management of its tradeshow program, periodically selecting a contractor through a competitive bidding process. In 2005 and 2010, Plaintiff Veer Right Management Group, Inc. ("Veer Right") successfully bid for the tradeshow contract in collaboration with its subcontractor, Defendant Czarnowski Display Service, Inc. ("Czarnowski"). The collaboration ended in 2013 when the Postal Service decided not to exercise a renewal option for Veer Right's contract and, after requesting bid proposals, selected Czarnowski as the new primary contractor.

2.     Veer Right contends that it lost the tradeshow contract because of a conspiracy between Czarnowski and Defendant Timothy Jenkins, Veer Right's Vice President. According to Veer Right, Jenkins disparaged his employer to Postal Service staff and then funneled trade secrets and confidential information to Czarnowski. Veer Right claims, among other things, that Jenkins breached his

fiduciary duty and that Defendants together misappropriated Veer Right's trade secrets and tortiously interfered with the tradeshow contract.

3. Czarnowski and Jenkins move for summary judgment as to all claims. They contend that discovery has refuted Veer Right's allegations of wrongdoing while also showing that the Postal Service decided not to renew the contract for business reasons unrelated to the Defendants. Having considered all relevant matters of record, the Court **GRANTS** Defendants' motions.

> *Ellis & Winters LLP, by Jonathan D. Sasser and Connors Morgan, PLLC, by C. Scott Meyers, for Plaintiff.*
>
> *Parker Poe Adams & Bernstein, LLP, by Melanie Black Dubis and Jami Jackson Farris, Hogan Marren, Ltd., by J. Michael Tecson, and General Counsel for Czarnowski Display Service, Inc., by Kelly M. Cherf, for Defendant Czarnowski Display Service, Inc.*
>
> *Harris Sarratt & Hodges, LLP, by John L. Sarratt, for Defendant Timothy Jenkins.*

Conrad, Judge.

I.
BACKGROUND

4. The Court does not make findings of fact in ruling on motions for summary judgment. The following background, drawn from the evidence submitted in support of and opposition to Defendants' motions, is intended to provide context for the Court's analysis and ruling.*

---

* The parties sequentially numbered the exhibits to the opening and response briefs. Defendants submitted Exhibits 1 through 37, and Veer Right submitted Exhibits 38 through 52. Veer Right also resubmitted some of the exhibits filed by Defendants, retaining the exhibit number assigned by Defendants. In four resubmitted exhibits containing deposition excerpts (2, 4, 6, and 12), Veer Right modified the exhibit by including additional excerpts. For these exhibits, this Opinion cites the ECF Number of the combined excerpts submitted by Veer Right.

Veer Right Mgmt. Grp., Inc. v. Czarnowski Display Serv., Inc., 2018 NCBC 6.

## A. Veer Right's Collaboration with Czarnowski

5. Tonia and Rodney Miller founded Veer Right in 2000 for the purpose of bidding on the Postal Service tradeshow contract. (*See* Ex. 38, Aff. T. Miller ¶ 6, ECF No. 132.) They succeeded, and from 2000 to 2005, Veer Right served as a subcontractor on the tradeshow contract. (*See* Aff. T. Miller ¶ 7.) In 2005, Veer Right made a successful bid to be the primary contractor, handling logistics and marketing, while its subcontractor, Czarnowksi, handled the "build-side," including setting up and breaking down trade show booths. (*See* Ex. 4, Dep. Gray 32:21–24, ECF No. 117; Aff. T. Miller ¶ 8.) Veer Right and Czarnowski appear to have performed their obligations under the 2005 contract without incident.

6. When the Postal Service solicited bids for a new contract in 2010 ("2010 Contract"), Veer Right and Czarnowski again partnered and won. (Aff. T. Miller ¶ 8.) The two companies worked together to develop their proposal. (*See* Ex. 9, Dep. R. Miller 51:8–53:3, ECF No. 77.) They did not execute a non-disclosure or confidentiality agreement. (Pl.'s Response to Czarnowski's Second Request to Admit, ¶ 2, ECF No. 67.)

7. The 2010 Contract's initial term ran from May 6, 2010 to September 30, 2011. (Ex. 7 at VR137–38, ECF No. 75.) This term could be extended by the Postal Service, at its discretion, through the exercise of up to "four one-year renewal options." (Ex. 8, Dep. Castellano 24:20–26:24, ECF No. 76; Dep. R. Miller 65:4–66:12.) The Postal Service exercised its options for 2011 and 2012. (*See* Dep. R. Miller 65:4–66:12; Aff. T. Miller ¶ 30.)

B. <u>The Millers' Relationship with Jenkins</u>

8. The Millers hired Timothy Jenkins (Tonia Miller's brother-in-law) as Veer Right's first employee and later promoted him to Vice President with responsibility for the Postal Service account. (Ex. 1, Aff. Jenkins ¶¶ 2, 5, ECF No. 69; Aff. T. Miller ¶¶ 13–14.) After years of working together, Jenkins's relationship with the Millers soured. In 2011, the Millers accused Jenkins of misappropriating company funds for personal purposes. (*See* Aff. T. Miller ¶ 17.) Jenkins negotiated a deal to pay back the money and sent a company-wide e-mail "to apologize to everyone." (Ex. 49, ECF No. 14.) Although Jenkins stayed with Veer Right, he complained that the Millers had "black mail[ed] [sic] [him] into staying." (Aff. T. Miller Tab 1.)

9. According to Veer Right, the episode embittered Jenkins, who began criticizing the Millers in e-mail exchanges with Christopher Karpenko, the Postal Service's manager of tradeshow events. (Ex. 2, Dep. Jenkins 18:5–6, ECF No. 116; Ex. 12, Dep. Karpenko 9:4–6, ECF No. 119.) Shortly after Karpenko was promoted to the position in 2012, Jenkins joked to him that Tonia Miller rarely came to the office "2 days in a row," (Ex. 45, ECF No. 139), and missed "countless deadlines" for Karpenko's predecessor, (Ex. 52, ECF No. 146). Jenkins continued to send reports to Karpenko about conversations with the Millers, contrary to the Millers' direction that all communications with the Postal Service required their approval. (*See* Exs. 46, 47, ECF Nos. 140, 141.)

10. Karpenko's promotion, Veer Right asserts, also coincided with significant changes in the management of the tradeshow program. In her affidavit, Tonia Miller

states that Karpenko "changed the scope of projects without explanation or warning, and made unreasonable demands on Veer Right's time and resources." (Aff. T. Miller ¶ 25.) Karpenko also directed the Millers to exclude their daughter from performing Postal Service work, for reasons the Millers contend were improper. (*See* Aff. T. Miller ¶¶ 27–29.)

## C. The Postal Service's Decision to Rebid the Tradeshow Contract

11. In January 2013, as part of its "standard practice" in an option year, the Postal Service began assessing whether to exercise a third one-year renewal option or instead to rebid the tradeshow contract. (Dep. Castellano 141:9–12; Notice of Filing, Ex. B 117:19–118:4 ["Dep. Castellano II"], ECF No. 148.) This process originated with Jeanne Castellano and Sheryl Gray, the Postal Service employees with responsibility for supplier contracts. (*See* Dep. Castellano 13:6–8, 141:2–15.) Castellano and Gray coordinated with Karpenko and his colleague, Brian Corley. (*See* Dep. Castellano 16:6–11, 74:22–75:20; Dep. Gray 84:19–85:13; Ex. 11, Dep. Corley 102:3–13, ECF No. 80.)

12. Castellano and Gray recommended holding a supplier workshop in June 2013 to ensure the decision to renew or rebid would be sound. (Dep. Castellano 57:3–13, 58:24–59:5; Dep. Gray 71:15–72:7; Dep. Corley 99:16–100:14.) The Postal Service requested and received presentations from several companies in the tradeshow market, including Veer Right. (*See* Dep. Castellano 59:6–21; Dep. Corley 99:16–25, 101:13–24.) Without Veer Right's knowledge, Czarnowski asked to present separately and was permitted to do so. (*See* Pl.'s Ex. 4, 191:12–15, ECF No. 117; Ex.

42, ECF No. 136; *see also* Dep. Castellano 62:25–63:1; Dep. Gray 69:16–22.) Although the Postal Service expected that Veer Right, as "our supplier," would "have the most knowledge to share," Castellano testified that Veer Right did not "put much effort . . . into preparation" and gave a "very disappointing" presentation. (Dep. Castellano 61:17–62:5; *see also* Dep. Corley 101:25–102:2, 103:10–24.)

13. Around the same time, Castellano and Gray reached out directly to Veer Right to see whether it could "offer any program/contractual changes that could result in cost savings" for the existing tradeshow contract. (Ex. 15, VR-15576, ECF No. 84; Dep. Gray 57:6–58:19, 81:18–23.) According to Gray, the Postal Service was "[l]osing billions of dollars" at the time, prompting similar requests to every contractor. (Dep. Gray 58:10; *see also* Dep. Corley 99:9–15.) Veer Right responded with a proposal the Postal Service found underwhelming. (Dep. Gray 88:22–89:4; Dep. Corley 94:4–12; Dep. Castellano 72:16–17, 74:15–21.)

14. In June 2013, the Postal Service reached an initial decision to allow the 2010 Contract to expire that September, the end of the fiscal year. (*See* Dep. Castellano 143:17–23.) Castellano received no objections from the internal chain of command, and the Postal Service issued a solicitation for a new tradeshow program contract on August 12, 2013. (*See* Dep. Castellano 74:5–14, 75:12–76:2, 76:12–77:21; Dep. Gray 92:9–19; Ex. 17, ECF No. 86.) Bids were due eleven days later. (Ex. 5, 2013 Solicitation at CZAR37962, ECF No. 73.)

15. The news prompted Rodney Miller to contact Michael Orlosky, Czarnowksi's point person for the 2010 Contract, requesting "to know right away if [Czarnowski]

plans to bid with veer right [sic] or on your own." (Ex. 17.) Orlosky responded that Czarnowksi would bid separately "and not includ[e] [Veer Right] in our response." (Ex. 17.) Veer Right elected to bid as a subcontractor on the primary bid submitted by another company, Freeman Decorating. (Dep. R. Miller 217:13–19.)

16. The Postal Service awarded Czarnowski the new tradeshow contract on September 25, 2013 ("2013 Contract"). (Aff. T. Miller ¶ 36.)

### D. Jenkins's New Employment with Czarnowski

17. Having lost the Postal Service contract, Veer Right determined it would have to lay off Jenkins. (*See* Aff. T. Miller ¶ 37; Compl. ¶ 55.) Tonia Miller encouraged him to apply for employment with Czarnowski. (Aff. T. Miller ¶ 40.) On October 7, 2013, Jenkins resigned from Veer Right and took a job with Czarnowski the next day. (*See* Dep. Jenkins 136:16–22.)

18. When Jenkins returned his work computer, Veer Right discovered that all software, including the operating system, had been deleted. (*See* Aff. T. Miller ¶¶ 42–43.) A forensic analysis revealed that Jenkins had made a copy of the hard drive before returning it and also that he forwarded a few electronic files to his personal e-mail address. (Aff. T. Miller ¶¶ 43–44, Tab 2.) Jenkins also accessed Veer Right's server after beginning his employment with Czarnowski. (Aff. T. Miller ¶ 44.)

19. Through its forensic analysis, Veer Right recovered some of Jenkins's e-mails. (*See* Ex. 40, Aff. Hunt ¶ 5, ECF No. 134.) According to Veer Right, the e-mails revealed that Jenkins had secretly communicated with Orlosky for months, beginning as early as April 2013. (*See* Aff. T. Miller ¶ 48.) Among other things,

Jenkins forwarded communications from the Postal Service regarding tradeshow sales leads, sent e-mails discussing the supplier workshop presentations, and forwarded Veer Right's cost savings proposal, telling Orlosky to "[k]eep this to yourself." (Ex. 26, ECF No. 123; Ex. 27 at CZAR33415, ECF No. 124.) In addition, just before the Postal Service's deadline for accepting bids expired in August 2013, Jenkins e-mailed Orlosky information regarding Veer Right's warehousing space and pricing. (Ex. 33, ECF No. 103; *see also* Dep. Jenkins 32:12–34:11.)

20. After the Postal Service awarded the new contract to Czarnowski, Jenkins communicated with Orlosky to discuss employment with Czarnowski. Jenkins complained that he had helped Czarnowski "in an indirect way" but, now that Czarnowski was "in the driver's seat," he was "being held to the fire" as it decided whether to hire him. (Ex. 34, ECF No. 104.)

### E. This Action

21. Veer Right filed this suit on July 11, 2014. Veer Right alleges seven causes of action: (1) breach of fiduciary duty against Jenkins; (2) aiding and abetting breach of fiduciary duty against Czarnowski; (3) tortious interference with Jenkins's employment contract against Czarnowski; (4) tortious interference with the 2010 Contract against Jenkins and Czarnowski; (5) misappropriation of trade secrets against Jenkins and Czarnowski; (6) civil conspiracy against Jenkins and Czarnowski; and (7) unfair or deceptive trade practices against Jenkins and Czarnowski. It also seeks punitive damages and attorney's fees.

22.     On June 30, 2017, Czarnowski and Jenkins filed separate motions for summary judgment, along with supporting briefs that incorporated each other's arguments by reference. (Czarnowski's Mem. in Supp. of Mot. for Summ. J. 9 ["Czarnowski Br."], ECF No. 61; Jenkins's Mem. in Supp. of Mot. for Summ. J. 1 ["Jenkins Br."], ECF No. 109.) Veer Right filed a single, combined opposition brief. Each Defendant filed a reply brief. On October 25, 2017, the Court held a hearing, at which all parties were represented by counsel. The motions are ripe for disposition.

## II.
## LEGAL STANDARD

23.     Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). In deciding a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmov[ant]," taking the non-movant's evidence as true and drawing inferences in its favor. *Furr v. K-Mart Corp.*, 142 N.C. App. 325, 327, 543 S.E.2d 166, 168 (2001).

24.     The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002). If the moving party carries this burden, the responding party "may not rest upon the mere allegations or denials of his pleading[s]," *Khashman v. Khashman*, No. COA16-765, 2017 N.C. App. LEXIS 715, at *15 (N.C. Ct. App. 2017) (unpublished), but must instead "come forward with specific facts establishing the presence of a genuine factual dispute for trial," *Liberty*

*Mut. Ins. Co.*, 356 N.C. at 579, 573 S.E.2d at 124. A "genuine issue" exists when "'it is supported by substantial evidence,' which is that amount of relevant evidence necessary to persuade a reasonable mind to accept a conclusion." *Id.* (citation omitted) (quoting *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002)).

III.
ANALYSIS

25. All of Veer Right's claims arise from its allegation that Defendants worked together to cause the Postal Service to end the 2010 Contract and then to steer the next tradeshow contract to Czarnowski. At the motion-to-dismiss stage, the Court concluded that Veer Right had "adequately alleged" such an agreement between Defendants, "with subsequent harm caused by implementing the agreement." (Order ¶ 21, ECF No. 29.)

26. On summary judgment, the Court must look beyond Veer Right's allegations to test the adequacy of its evidence. Here, Veer Right falls short. As Defendants argue, Veer Right has not offered sufficient evidence to show a "causal link" between any of their alleged conduct and the Postal Service's decisions to rebid the 2010 Contract and to award the 2013 Contract to Czarnowski. (Czarnowski's Reply Br. in Supp. of Mot. for Summ. J. 1 ["Czarnowski Reply"], ECF No. 147; *see also* Jenkins's Reply Mem. in Supp. of Mot. for Summ. J. 3 ["Jenkins Reply"], ECF No. 149.) To the contrary, Postal Service employees testified uniformly that it made a business decision based on factors unrelated to Defendants. As a result, there is no genuine dispute for a jury to decide, and summary judgment is appropriate.

A. Breach of Fiduciary Duty, Aiding & Abetting, and Civil Conspiracy

27. Veer Right's principal claim is that Jenkins breached his fiduciary duty by disparaging the Millers to Karpenko (after Karpenko began managing the tradeshow program in 2012) and sharing confidential information with Czarnowski (during the bidding for the 2013 Contract). (*See* Veer Right's Br. Opposing Defs.' Summ. J. Mots. ["Opp'n"] 2, 12–15, ECF No. 114.) It further alleges that Czarnowski actively conspired in the scheme and aided and abetted Jenkins's breach.

28. Neither Jenkins nor Czarnowski contests the fact that Jenkins, as Veer Right's Vice President, owed the company a fiduciary duty. Rather, Jenkins argues there is "no evidence" that he "conveyed any confidential or trade secret information to Czarnowksi" or that "anything [he] did resulted in Czarnowski obtaining the [Postal Service] contract." (Jenkins Reply 2, 3.) Czarnowski likewise argues that Veer Right has failed to establish a causal connection between the alleged breach and its damages. (*See* Czarnowski Br. 6–7; Czarnowski Reply 1, 6.) Together, Defendants contend that the absence of evidence of causation requires summary judgment as to the claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and civil conspiracy.

29. As the North Carolina Court of Appeals has explained, "[c]ertain torts require as an essential element that a plaintiff incur actual damage." *Dove v. Harvey*, 168 N.C. App. 687, 691, 608 S.E.2d 798, 801 (2005). "These torts include breach of fiduciary duty." *Id.* (citing *Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 589, 581 S.E.2d 68, 76 (2003)). Thus, "to establish a claim for breach of

fiduciary duty, plaintiff must show that: (1) defendant owed plaintiff a fiduciary duty; (2) defendant breached his fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to plaintiff." *Miller v. Burlington Chem. Co., LLC*, 2017 NCBC LEXIS 6, at *23 (N.C. Super. Ct. Jan. 27, 2017) (citing *Farndale Co., LLC v. Gibellini*, 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006)).

30.     The only alleged injury here, as confirmed by counsel at the hearing, is Veer Right's loss of the "profits" it would have received "for the years 2014 and 2015" if the Postal Service had not allowed the 2010 Contract to expire. (Czarnowksi's Mot. to Compel, Ex. 1, Pl.'s Objections and Responses to Def. Czarnowski's First Set of Interrogs. ¶ 25, ECF No. 40.1.) Thus, to establish the third element of its claim for breach of fiduciary duty, Veer Right must show that Defendants proximately caused the Postal Service not to exercise its renewal options for the 2010 Contract.

31.     The evidence overwhelmingly supports Defendants' position that there is no causal link. All four of the Postal Service employees who participated in the decision to rebid the 2010 Contract were deposed. Each pointed to sound business reasons not to renew the 2010 Contract; none attributed the decision to Defendants' actions. (*See, e.g.*, Dep. Gray, 150:6–151:6; Dep. Castellano II 117:6–13.)

32.     For example, Castellano testified that it was "standard practice" to review the 2010 Contract in an option year. (Dep. Castellano II 117:19–118:4.) During the course of the review, Castellano and other Postal Service employees were underwhelmed by Veer Right's responses. Castellano faulted Veer Right's presentation at the June 2013 supplier workshop, characterizing it as "very

disappointing" and noting that Veer Right "had not put much effort, from our perspective, into preparation of the presentation." (Dep. Castellano 61:21–24.) Corley echoed these concerns. (*See* Dep. Corley 103:19–25.) Veer Right's response to a request for cost savings was equally discouraging: Gray deemed it "relatively minimal," and Castellano testified that she had hoped for "[m]ore creative solutions, as well as deeper discounts." (Dep. Gray 89:1–8; Dep. Castellano 74:15–21.) These disappointments, combined with Veer Right's long tenure as a tradeshow contractor, moved the Postal Service not to exercise its renewal option. (Dep. Gray 87:9–89:10; Dep. Corley 103:10–104:5; *see also* Dep. Castellano II 117:6–13.)

33. Veer Right provides no reason to discount this clear, uniform testimony—all of which comes from the individuals with direct knowledge of the reasons for the Postal Service's decision. In response, it was incumbent on Veer Right to produce specific evidence to establish a genuine dispute for trial. It has not done so. At no point does Veer Right's brief squarely address causation or point to any evidence tending to show that the Postal Service's decision was based on anything other than its own reasoned business judgment and Veer Right's sub-par presentations. (*See* Opp'n 13, 19 n.9.)

34. The evidence Veer Right does offer—for example, Jenkins's disparagement of the Millers in his e-mails to Karpenko—goes instead toward establishing a breach by Jenkins. Even assuming that Jenkins's actions rise to the level of a breach of his duty of loyalty (a question the Court need not address), a breach that causes no injury is not actionable. Of the varied reasons the Postal Service employees offered as

grounds for their decision, none related to Jenkins's e-mails, perhaps because no one other than Karpenko was even aware of them. (*See, e.g.*, Dep. Castellano 115:16–24; Dep. Gray 87:9–89:10.) Karpenko, who did receive the e-mails, downplayed them as "banter." (Dep. Karpenko 111:8–10.) Especially in view of this testimony, the existence of the e-mails, standing alone, is not sufficient to permit an inference that Jenkins caused the Postal Service to take action.

35. So too for the allegation that Jenkins covertly shared information with Czarnowski. Veer Right highlights a series of ten e-mails from Jenkins to Czarnowski that allegedly include confidential information. Only one was sent before the Postal Service decided not to exercise its renewal option, and there is no indication this e-mail (of which the Postal Service was unaware) bears any relationship to the Postal Service's decision. (*See* Ex. 28, ECF No. 98.) The remaining e-mails came *after* that decision and therefore could not have influenced it.

36. To the extent Veer Right contends the information gave Czarnowski an advantage in bidding for the 2013 Contract, it has not alleged any damages beyond those associated with the expiration of the 2010 Contract. In any event, Veer Right has not offered a coherent explanation of the advantage Czarnowski supposedly gained. Veer Right does not argue, or cite evidence, that Czarnowski used any of the information in its bid. (*See generally* Opp'n 13–15.) Even if there were such evidence, some of the information was already in Czarnowski's possession. (Ex. 27; Dep. R. Miller 277:1–279:15; *see also* Ex. 41 at CZAR31673.) Other information had no relevance to the bidding process. (Exs. 28–32, ECF Nos. 98–102; Dep. Corley 130:4–

131:9, 134:25–136:11; Dep. Castellano 122:20–123:3, 125:2–12; Dep. Porporino 120:1–121:2.) And there is no evidence that the Postal Service would have awarded the 2013 Contract to Veer Right in the absence of Jenkins's communications with Czarnowski.

37. At the hearing, Veer Right's counsel suggested that it was hindered in its efforts to develop evidence because Jenkins erased his company computer before returning it, perhaps deleting incriminating e-mails and other evidence. Whether that is true or not, it is Veer Right's burden, as plaintiff, to prove its claims, even if the burden in this case may be more difficult to carry than usual. The Court cannot draw an inference in Veer Right's favor from the *absence* of evidence. Veer Right has not made a spoliation argument, nor did it move to compel additional discovery from Defendants. Furthermore, Veer Right had a full and fair opportunity to depose the key Postal Service personnel, which failed to unearth any evidence that actions by Defendants caused the decision not to renew the 2010 Contract.

38. In short, the undisputed evidence shows that the Postal Service allowed the 2010 Contract to expire for many reasons, none having to do with Jenkins's actions. (*See* Dep. Castellano 115:16–24; Dep. Gray 87:9–89:10; Dep. Corley 103:10–104:5.) "Without an injury proximately caused by a breached fiduciary duty," Veer Right has no claim against Jenkins. *Chisum v. Campagna*, 2017 NCBC LEXIS 102, at *17–18 (N.C. Super. Ct. Nov. 7, 2017); *see also Fogartie v. Edrington*, 2017 NCBC LEXIS 106, at *20 (N.C. Super. Ct. Nov. 17, 2017) (denying preliminary injunction where alleged breach of fiduciary duty did not proximately cause harm). Accordingly, the Court

grants summary judgment as to Veer Right's claim for breach of fiduciary duty. *See Dove*, 168 N.C. App. at 692, 608 S.E.2d at 801 (affirming dismissal of claim for breach of fiduciary duty where alleged breach did not cause damage).

39. For the same reasons, the Court grants summary judgment as to Veer Right's claims for conspiracy and for aiding and abetting the breach of fiduciary duty. Each depends on the existence of an underlying claim for breach of fiduciary duty and cannot stand independently. *See Piraino Bros. LLC v. Atl. Fin. Grp., Inc.*, 211 N.C. App. 343, 350, 712 S.E.2d 328, 333 (2011); *Sec. Camera Warehouse, Inc. v. Bowman*, 2017 NCBC LEXIS 39, at *17–18 (N.C. Super. Ct. May 1, 2017). In view of this ruling, the Court need not address Czarnowski's alternative argument regarding the status of a claim for aiding and abetting in North Carolina.

B. Tortious Interference with the Tradeshow Contract

40. Causation is also the key issue in evaluating Veer Right's claim that Defendants tortiously interfered with the 2010 Contract. (*See* Compl. ¶ 102.) According to Veer Right, "Czarnowski intentionally induced the [Postal Service] to put the Tradeshow Contract up for bid." (Compl. ¶ 100.) Defendants contend there is no evidence to support the allegations of inducement and that any interference by Czarnowski was justified as an exercise in competition. (*See* Czarnowski Br. 16–17.)

41. As an initial matter, it is unclear whether Veer Right's claim is better characterized as one for tortious interference with an existing contract or for tortious interference with prospective advantage. Claims for tortious interference with contract typically concern a defendant's actions to induce a third party "not to

perform" under an existing contract. *Privette v. Univ. of N.C. at Chapel Hill*, 96 N.C. App. 124, 134, 385 S.E.2d 185, 190 (1989) (quoting *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)). Here, the dispute concerns an allegation that Defendants induced the Postal Service to let the 2010 Contract expire by not exercising a renewal option. This allegation may align more closely with a claim for tortious interference with prospective advantage—that is, that Defendants induced the Postal Service "not to enter a contract with" Veer Right, which the Postal Service "would have entered into but for the interference." *Dalton v. Camp*, 353 N.C. 647, 654, 548 S.E.2d 704, 709 (2001).

42. Regardless of which characterization is more appropriate, the question before the Court is the same: whether Veer Right has forecast sufficient evidence to show that Defendants caused the Postal Service not to renew the 2010 Contract and instead to put the contract up for bid. As discussed above, all of the relevant evidence shows that the Postal Service rendered its decision not to renew the 2010 Contract based on Veer Right's underwhelming workshop presentation, disappointing cost savings proposal, and lengthy tenure as tradeshow contractor. (*See, e.g.*, Dep. Castellano 61:17–62:5, 74:15–21; Dep. Gray 88:16–89:4; Dep. Corley 103:10–104:5.) No evidence tends to show that the Postal Service would have exercised its renewal option but for Defendants' alleged actions. Accordingly, "nothing in the record reflects an improper inducement on the part of" Defendants. *Dalton*, 353 N.C. at 655, 548 S.E.2d at 710 (affirming grant of summary judgment).

43.    Veer Right's opposition includes a single paragraph addressing this claim, which again ignores causation.   Veer Right instead focuses exclusively on Czarnowski's decision to make its own presentation, without Veer Right's knowledge, at the supplier workshop.  (*See* Opp'n 21 (citing Ex. 42; Ex. 4 at 191).)  But the undisputed evidence shows that Czarnowski's presentation had no influence on the Postal Service's decision.  Castellano testified that the supplier workshop is "not trying to give advantage to one supplier over another" and that she had no specific recollection of Czarnowski's presentation.  (Dep. Castellano 59:24–60:1, 63:11–13.)  Moreover, Veer Right has not argued or provided evidence that Czarnowski undermined Veer Right's own presentation.

44.    Veer Right's brief also objects, without amplification, to "an apparent effort to steer the Contract to Czarnowski."  (Opp'n 21.)  To the extent this argument refers to the 2013 Contract rather than the 2010 Contract, it is foreclosed by the complaint. Veer Right's claim, as alleged, concerns interference with the 2010 Contract, not with the 2013 bidding.  (*See* Compl. ¶¶ 98–104; *see also* Pl.'s Objections and Responses to Def. Czarnowski's First Set of Interrogs. ¶ 25.)  Veer Right may not amend its claim through its briefing.  *See* N.C. R. Civ. P. 15(a); *see also, e.g.*, *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

45.    Accordingly, there is no genuine issue of material fact regarding whether Defendants induced the Postal Service not to renew the 2010 Contract.  The Court

grants Defendants' motions for summary judgment as to the claim for tortious interference with the tradeshow contract.

## C. Tortious Interference with Jenkins's Employment

46. In its complaint, Veer Right alleges that Czarnowski tortiously interfered with non-competition and non-disclosure agreements between Veer Right and Jenkins, along with duties Jenkins owed to Veer Right according to its Employee Policies and Procedures. (*See* Compl. ¶¶ 13, 94; *see also* Ex. 19, Pl.'s Objections and Second Suppl. Responses to Czarnowski's First Set of Interrogs. ¶ 3, ECF No. 88.) Veer Right has not put forward any evidence concerning these agreements, and its opposition brief does not address them or provide any basis to deny summary judgment. (*See generally* Opp'n 19–20; Pl.'s Response to Czarnowski's Second Request to Admit ¶¶ 5–7.) Accordingly, there is no genuine issue of material fact as to these agreements.

47. Veer Right maintains, however, that Czarnowski interfered with Jenkins's at-will employment. (Opp'n 19–20.) The gist of its claim is that Czarnowski induced Jenkins "to betray" Veer Right (by seeking to bring an end to the 2010 Contract) in return for a "promise that Czarnowski would reward this behavior by giving him a job if Czarnowski obtained" the tradeshow contract. (Opp'n 20.)

48. Defendants again argue that there is no evidence their "conduct resulted in any damages to" Veer Right. (Czarnowski Reply 7.) The Court agrees. In response to the Postal Service's decisions not to renew the 2010 Contract and to award the 2013 Contract to Czarnowski, Veer Right could not afford to employ Jenkins. (*See*

Aff. T. Miller ¶ 37.) Tonia Miller encouraged Jenkins to look elsewhere for employment, including with Czarnowski. (Aff. T. Miller ¶ 40.) In other words, Jenkins resigned from Veer Right and began employment with Czarnowski as a direct result of the Postal Service's decisions. Because there is no evidence that Defendants caused the Postal Service to end the 2010 Contract, there is also no evidence their actions caused harm to Veer Right for Jenkins's departure following the loss of that contract. Defendants are entitled to summary judgment.

### D. Misappropriation of Trade Secrets

49. In its claim for trade-secret misappropriation, Veer Right initially asserted that Jenkins funneled trade secrets to Czarnowski before and during the bidding for the tradeshow contract in 2013. This allegation centered on the ten e-mails sent by Jenkins to Czarnowski from May to October 2013. (*See* Compl. ¶¶ 76(c), 110(b); Ex. 23, Pl.'s Objections and Suppl. Responses to Czarnowski's First Set of Interrogs. ¶ 13, ECF No. 92; *see also* Exs. 25–34, ECF Nos. 95–104.) Veer Right now concedes that these e-mails do not contain trade-secret information. (*See* Opp'n 21–23; *see also* Jenkins Br. 2–4; Czarnowski Br. 20; Czarnowski Reply 9–10.) Accordingly, there is no evidence that Czarnowski acquired or used Veer Right's trade secrets to gain an advantage in bidding for the 2013 Contract.

50. Veer Right continues to argue that Jenkins took its trade secrets when he resigned in October 2013 and began working for Czarnowski. (Compl. ¶ 110.) According to Veer Right, a forensic computer consultant determined that Jenkins copied the hard drive of his company computer before returning it to Veer Right. (*See*

T. Miller Aff. ¶ 43.) Also, after joining Czarnowski, Jenkins remotely accessed Veer Right's computer systems. (*See* T. Miller Aff. ¶ 44.)

51. Defendants argue that Veer Right has not identified any protectable trade secrets. (Czarnowski Br. 18–21.) They further argue that, even if Veer Right has sufficiently identified its trade secrets, it has failed to make out a prima facie case of misappropriation because "[n]o documents or emails were produced or identified demonstrating that such trade secrets were acquired by Czarnowski." (Czarnowski Br. 21.)

52. The North Carolina Trade Secrets Protection Act defines trade secret to mean "business or technical information" that "[d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66-152(3). Courts consider six factors to determine if information qualifies as a trade secret:

> "(1) [t]he extent to which information is known outside the business;
> (2) the extent to which it is known to employees and others involved in
> the business; (3) the extent of measures taken to guard secrecy of the
> information; (4) the value of information to business and its competitors;
> (5) the amount of effort or money expended in developing the
> information; and (6) the ease or difficulty with which the information
> could properly be acquired or duplicated by others."

*Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997).

53. The record as to the nature of Veer Right's trade secrets is nearly barren. In the complaint, Veer Right alleges that its trade secrets related to "all aspects" of trade shows, including identifying shows, staffing, pricing, logistics, and related information. (Compl. ¶ 107.) The only evidence Veer Right has supplied to prove its allegations is Tonia Miller's affidavit, which does little to elaborate. According to Tonia Miller, the protectable trade secrets relate to five aspects of trade show operations: (1) "[k]nowledge" of Postal Service staffing considerations; (2) "[f]ormulas for deciding what sized booth is best suited for a show"; (3) "[m]ethods for determining which products and services should be offered by a client at a particular event"'; (4) "[s]etting up software" to manage "sales leads generated at tradeshow events"; and (5) various unnamed charts, policies, and spreadsheets. (Aff. T. Miller. ¶ 9.)

54. These high-level descriptions are plainly inadequate to survive summary judgment. "It is generally accepted that a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003). Veer Right has provided no evidence of what knowledge, formulas, and methods it is seeking to protect. It has not identified the steps of any process, the particular combination of components of any formula, or the characteristics that render them unique in comparison with information available in the public domain. *See DSM Dyneema, LLC v. Thagard*, 2014 NCBC LEXIS 51, at *19 (N.C. Super. Ct. Oct. 17, 2014).

55.    The only specific documents identified by Veer Right are certain electronic files.  (*See* Opp'n 21–23; Aff. T. Miller, Tab 2.)  The filenames suggest these documents contain Veer Right's standard operating procedures.   Yet Veer Right has not introduced the actual files, summarized their contents (such as the nature of the operating procedures), or provided any basis to conclude that they contain information that should be protectable as a trade secret.  (*See generally* Opp'n 23; Aff. T. Miller ¶ 49, Tab 2.)

56.    The undisputed facts further show that Veer Right's efforts to maintain the secrecy of its information were not reasonable under the circumstances.  *See* N.C. Gen. Stat. § 66-152(3).  Veer Right concedes there is "no signed and written non-disclosure or confidentiality agreement between Czarnowski and Veer Right."  (Pl. Response to Second Request to Admit Facts ¶ 2.)  In addition to the absence of an agreement, Tonia Miller acknowledges that "some of Veer Right's information was shared with its subcontractor Czarnowski." (Aff. T. Miller ¶ 12.)  Indeed, Veer Right's tradeshow "bible" binder was kept at tradeshows in an office to which all Postal Service and Czarnowski employees had access.  (Dep. R. Miller 121:18–20, 131:12–132:1; Aff. J. Killion ¶ 6, ECF No. 63; Aff. M. Lively ¶ 6, ECF No. 64.)  Although Tonia Miller states that Czarnowski never "had access to the entire compilation" of confidential information, there is no evidence identifying what information was withheld.  (Aff. T. Miller ¶ 12.)

57.    Veer Right points to its employee handbook, which directs "all employees" to "safeguard sensitive company information," and provides that "[a]ll such

information shall be appropriately marked or verbally identified to each employee." (Ex. 43 at 26, ECF No. 137.) Veer Right has produced no evidence, however, that it actually identified confidential information to employees as required by the handbook, and documents Veer Right alleges it considered confidential were never marked as such. (*See* Ex. 43 at 26; Dep. R. Miller 152:8–154:18.) A reasonable juror could not conclude these measures were adequate to maintain the secrecy of Veer Right's information, particularly in view of its failure to identify which information it did or did not share with Czarnowski.

58. Finally, the Court agrees with Defendants that Veer Right has not made out a prima facie case of misappropriation. The record is conspicuously silent as to what information Jenkins took when he copied his hard drive and later remotely accessed Veer Right's systems. In her affidavit, Tonia Miller does not identify the contents of Jenkins's hard drive or otherwise explain what information Jenkins acquired. (*See* T. Miller Aff. ¶¶ 43–44; *see also* Opp'n 23.) Likewise, Veer Right's forensic consultant reports he "was able to restore certain deleted files and e-mail" but provides no additional information on what files were restored. (*See* Aff. Hunt ¶¶ 4–7, ECF No. 40.) Veer Right's speculation that Jenkins acquired trade secrets is not sufficient to create a jury question. *See Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 23, at *18 (N.C. Super. Ct. March 15, 2017) (citing *Am. Air Filter Co. v. Price*, 2017 NCBC LEXIS 9, at *23 (N.C. Super. Ct. Feb. 3, 2017)).

59. For these reasons, the Court concludes there is no genuine issue of material fact as to the claim for misappropriation of trade secrets. The Court grants Defendants' motions as to this claim.

## E. Section 75-1.1

60. To establish a claim for unfair or deceptive trade practices, a plaintiff must show that "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711; *see also* N.C. Gen. Stat. § 75-1.1. Veer Right's section 75-1.1 claim is premised on the same acts underlying each of its other claims—the alleged conspiracy to interfere with the 2010 Contract and to misappropriate its trade secrets. For the reasons discussed above, Veer Right has not offered evidence, sufficient to create a genuine issue of fact, that any of Defendants' actions proximately caused Veer Right's alleged damages or that Defendants misappropriated trade secrets. Accordingly, the Court grants Defendants' motions as to Veer Right's section 75-1.1 claim.

## F. Punitive Damages

61. Finally, having concluded that Defendants are entitled to summary judgment as to all claims, the Court further concludes that Veer Right cannot recover punitive damages. Liability for compensatory damages is a prerequisite to an award of punitive damages. *See* N.C. Gen. Stat. § 1D-15(a). The Court therefore grants Defendants' motions as to Veer Right's demand for punitive damages.

## IV.
## CONCLUSION

62. For the reasons stated above, Defendants' motions are **GRANTED**. Plaintiff's complaint is dismissed in its entirety.

This the 24th day of January, 2018.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
for Complex Business Cases