IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-285

Filed 18 June 2024

Buncombe County, No. 21 CVS 3299

MIKE HALE, Plaintiff,

v.

WILLIAM ERIC MACLEOD, MD, JONATHAN PAGE, and GREEN FARMS COMPANY, LLC, Defendants.

Appeal by plaintiff from an order entered 29 August 2022 by Judge Daniel A. Kuehnert in Buncombe County Superior Court. Heard in the Court of Appeals 20 September 2023 in session at Wake Forest University School of Law in the City of Winston-Salem pursuant to N.C. Gen. Stat. § 7A-19(a).

> *Law Offices of Matthew K. Rogers, PLLC, by Matthew K. Rogers, and Allen Stahl & Kilbourne, PLLC, by James. W. Kilbourne, Jr. for plaintiff-appellant.*

> *Fitzgerald Hanna & Sullivan, PLLC, by Douglas W. Hanna, for Jonathan Page, defendant-appellee.*

WOOD, Judge.

Mike Hale ("Hale") appeals the trial court's 29 August 2022 order dismissing with prejudice his complaint against Green Farms Company, LLC ("GF Co."), its Manager William MacLeod ("MacLeod"), and its CEO, Jonathan Page ("Page"), alleging numerous causes of action involving fraud, securities fraud, breach of fiduciary duties, breach of contract, and unfair and deceptive trade practices. GF Co. operated in the hemp and CBD industry. We affirm in part and reverse in part.

## I. **Factual and Procedural History**

Hale and his wife were friends with MacLeod's sister, who at some point introduced them to MacLeod. Hale learned MacLeod was an orthopedic surgeon who was no longer practicing medicine but was now involved in successful business ventures. On or about 8 March 2020, Hale met with MacLeod to discuss MacLeod's business ventures, including hemp and cannabidiol ("CBD"). During their meeting, Hale told MacLeod that he was interested in investing in local business opportunities. That same day, Hale emailed MacLeod to say that he was specifically interested in participating in the initial round of funding for the hemp and CBD business. Thereafter, MacLeod introduced Hale to Page, the CEO of GF Co. MacLeod and Page told Hale that MacLeod was the majority and controlling shareholder of GF Co., and that they both were personally liable for the success of GF Co.

On 12 March 2020, all three men participated in a Zoom video conference call during which Page and MacLeod made representations regarding the state of GF Co. and the hemp and CBD industries. After the call, Page sent two documents to Hale via email: (1) a competitive analysis to help Hale better understand the CBD market, key players in it, and GF Co.'s market share, and (2) a four-year Cash Flow Return on Investment projection analysis. In further emails, Page and MacLeod discussed in detail GF Co.'s current business, customers, financial information, and confidential information. Page represented in writing that the Return-on-Investment analysis showed: "$5 [million] invested for 10% of the company generates 7.2 x cash on cash

return in 4 years. This is merely the gain on the interim distributions made from cash (not on a liquidation event). Additional gain would be realized on years 5 and forward on liquidation." Page also represented in writing that GF Co. had engaged Emmet Moore ("Moore"), a Certified Public Accountant, as "CFO and VP of Finance." Page wrote that Moore had previous experience of executing two IPOs (Initial Public Offerings), raising over $2 billion in debt and equity financing, and managing extensive mergers and acquisitions activity. Later in March, Moore made representations to Page regarding GF Co.'s financial condition and continuing growth prospects, as well as his own confidence in and commitment to GF Co.'s management.

Page subsequently introduced Hale to Mark Van Kirk ("Van Kirk"). Page informed Hale that Van Kirk was responsible for putting together a financial instrument for GF Co. MacLeod, Van Kirk, and Page each stated to Hale that to ensure he would be repaid funds, they wanted him to loan capital to GF Co. as a secured creditor rather than taking an equity interest in GF Co.

MacLeod, Van Kirk, and Page provided Hale with a "capitalization table" which represented GF Co. had a "Pre-Money Valuation" of $160,000,000.00 and had already raised $20,770,550.00 in "Total Capital." MacLeod and Page told Hale that GF Co.'s assets were worth more than enough to ensure that, in the worst-case scenario, Hale's loan would be repaid in full in the event of liquidation of the business. Subsequently, Van Kirk told Hale that he was not as confident in GF Co. as were MacLeod and Page, and for that reason he insisted the deal be offered to Hale as a

loan with personal guarantees from MacLeod and Page. Van Kirk explained that he was involved in structuring and documenting a "convertible note" secured by GF Co.'s assets and personally guaranteed by both MacLeod and Page.

On or about 2 July 2020, "at the direction, with the approval of and on behalf of MacLeod," Page provided Hale with a package of documents titled "Convertible Note Investor Package" (the "Note Package"), dated June 2020. Hale signed the Convertible Promissory Note on 2 July 2020 by which he agreed to loan $250,000.00 to GF Co.

The Note Package contains "Letters from Management" from both MacLeod as Chairman and Page as CEO of GF Co. Page's signed Personal Letter states, among other things:

> At Green Farms Co, we've made substantial progress towards scaling up this company to a billion-dollar valuation (with over $100 million in our deal pipeline today)[.]
> . . .
>
> *That's why I have chosen to personally guarantee this Note Series, pledging my personal balance sheet*, because I see the CBD green rush right around the corner and I know with this next round of financing, Green Farms will be in the right position at the right time to seize it.

(Emphasis added).

The Note Package also contained a "Pro-Forma and Deck," which was a slideshow of information about GF Co.'s business prospects. The slideshow stated GF Co. could "conservatively generate $18.6 MM in monthly revenues." The "Pro-Forma

and Deck" also contained a section titled "Capital Stock & Liquidation Analysis." This section represented that GF Co. had $20,770,550.00 "Total Capital" and $399,595.00 "Senior Debt," or just 1.9 percent of Total Capital. A slide titled "Pro Forma Liquidation Scenario Analysis" stated GF Co.'s liquidation value as $11,408,054.00, which included the projected value of assets purchased with capital raised from the convertible note round. A slide titled "Green Farms Pipeline Detail" listed prospective business with other companies at various stages of the negotiation process—either "Contract", "LOI" (Letter of Intent), or "Pipeline," with most prospective business opportunities being "Pipeline" opportunities. The projected income statement predicted $22,945,191.00 in revenue by the end of 2020, and the projected cash flow statement predicted positive cash flow beginning by the end of 2021.

A separate section of the "Pro-Forma and Deck" titled "Convertible Note Round" detailed the "Convertible Note Terms." "Key Terms" of the note included "Full collateralization of principal by equipment from lab build-out and existing equipment" and "Personal guarantees from [MacLeod] and [Page] and a corporate guaranty." The Convertible Note Terms also stated: "Fully Collateralized" and "Full Guaranties." A "Convertible Note Summary" slide repeated these representations.

Included in the Note Package provided by Page was a document titled "Convertible Promissory Note" signed by Page *in his capacity as CEO*. Hale was listed as the "Holder" of the note. The Convertible Promissory Note dated 2 July 2020

stated a loan amount of $250,000.00. The Convertible Promissory Note included a

disclaimer stating that the instrument was not registered under the Securities Act of

1933 or any other securities law pursuant to applicable exemptions.

Under the terms of the Convertible Promissory Note, repayment of the note

would be secured by the property and assets set forth in Schedule 1 which was

attached to the Convertible Promissory Note and listed various real estate and

personal property. The Convertible Promissory Note further stated:

> To secure the payment of the Notes, promptly when due,
> and the Company's obligations under the Notes, the
> Company hereby pledges and assigns to the Holders, and
> hereby grants to the Holders, a first ranking security
> interest in and lien on the Collateral not already
> encumbered. Borrowers shall provide Holders a
> subordinate lien and security interest on Collateral already
> encumbered.

Regarding filing financing statements, the Convertible Promissory Note provided:

> Upon the final closing of [the note], the Company hereby
> irrevocably authorizes the Administrative Agent[1] . . . at
> any time and from time to time to file in any filing office in
> the appropriate UCC jurisdictions any initial financing and
> continuation statements and amendments thereto . . . . The
> Company hereby covenants to give, execute, deliver, file
> and/or record any financing statement, notice, instrument,
> document, agreement, or other papers requested by the
> Administrative Agent (in his absolute and sole discretion)
> to create, preserve or perfect the security interest granted
> pursuant hereto or, after the occurrence of an Event of
> Default[,] . . . to enable the Holders to exercise and enforce
> their rights hereunder with respect to such pledge and
> security, including without limitation, causing any or all of

---

[1] The Convertible Promissory Note stated Van Kirk was the Administrative Agent.

> the Collateral to be transferred of record into the name of
> Holders or their nominee.

The Convertible Promissory Note included disclaimers for economic risk, stating that the Holder acknowledges he could suffer a complete loss of the Holder's investment. The Convertible Promissory Note also included a disclaimer regarding the "Forward-Looking Statements" within the Note Package, which stated that there "is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements."

As for guarantees of the loan, the Convertible Promissory Note stated MacLeod and Page

> will personally guarantee the aggregate principal balance under this Note then outstanding (the "Guarantee Amount"). Each guarantor will carry only a percentage of the Guarantee Amount equal to the guarantor's percent ownership in the Company. For example, Mr. Page owns five percent (5%) of the Company. His personal guarantee will be limited to five percent (5%) of the Guarantee Amount. A guarantor will be relieved of said guarantor's personal guarantee if said guarantor . . . no longer owns any portion of the Company or the Company has terminated the guarantor's employment with the company.

Page signed a separate document titled "Personal Guaranty," also dated 2 July 2020, identifying Page as a "Guarantor," and stating his guarantee was up to the amount of the "Cap," which was defined as five percent of the value of the Convertible Promissory Note, corresponding to Page's five percent ownership in GF Co. At Section 7, the Personal Guaranty contained a "Release of Guaranty" clause which

stated Page would be relieved of his obligations if he "no longer owns any portion of the Company . . . or the Company has terminated [Page's] employment with the Company."

Section 11 of the Personal Guaranty contained a "Governing Law; Submission to Jurisdiction Clause" that stated:

> The Guarantor [Page] irrevocably and unconditionally agrees that it will not commence any action, litigation, or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against the Holder, in any way relating to this Guaranty or the transactions contemplated hereby, in any forum other than the state courts located in Buncombe County, North Carolina or the U.S. District Court for the Western District of North Carolina[.]

Schedule 2 was attached to the Convertible Promissory Note and stated the "Company will achieve the minimum Revenue measured on a trailing twelve-month basis of not less than" $35,000,000.00 by 30 June 2021. Schedule 2 further covenanted that GF Co. would furnish to Hale:

> (i) the unqualified, audited fiscal year-end financial statements of the Company . . . no later than sixty (60) days after the Date of Note for the year 2019 and then no later than June 30 of the subsequent fiscal year
>
> (ii) no later than 30 days after the end of each calendar quarter, the internally prepared quarterly financial statements of the Company, certified by Company's chief financial officer, each containing consolidated and consolidating profit and loss statements for the quarter then ended and for Company's fiscal year to date, consolidated and consolidating balance sheets as at the last day of such quarter and a consolidated statement of cash

flows for the quarter then ended and for Company's fiscal
year to date.

After Hale made the $250,000.00 loan, GF Co. did not provide Hale any of the financial information GF Co. covenanted to furnish in Schedule 2 of the Convertible Promissory Note. Hale did not receive any communication from GF Co., MacLeod, or Page until he received an email on 14 May 2021 notifying him that GF Co. had assigned its assets and filed for liquidation in a Michigan circuit court to distribute assets (the "Michigan Liquidation").

On 18 May 2021, MacLeod and Page called Hale to inform him that GF Co. had shuttered its business because it was no longer viable primarily due to the price reduction of CBD oil. They also informed Hale they had caused GF Co. to file liquidation proceedings in Michigan and that they both had voluntarily resigned from GF Co.'s management. They stated GF Co.'s assets were valued at a discounted rate of $6.1 million, that secured creditors, including Hale, were owed $5.3 million, and asserted they believed all creditors would be paid. In June 2021, Hale emailed Van Kirk regarding performing his responsibilities as Administrative Agent. Van Kirk expressed surprise and indicated his intent to resign as Administrative Agent.

On 22 June 2021, Hale's lawyer served a Notice of Default and Demand to GF Co.'s principal place of business in Asheville, North Carolina, and to MacLeod's and Page's email addresses. On 28 June 2021, Steven Gross ("Gross"), representing MacLeod and Page, emailed Hale's lawyer. Gross stated that GF Co. had transferred

all legal and equitable title to all of its assets to a Series LLC responsible for liquidating GF Co. and distributing the liquidation proceeds to its creditors. Gross explained it was GF Co.'s belief that an assignment for the benefit of creditors under Michigan law (where GF Co.'s real estate was located) would be "the most efficient means of liquidating its assets in an orderly, controlled manner." Gross further explained GF Co. assigned ownership of all of its assets to the assignee LLC "much like what happens in a [C]hapter 7 Bankruptcy." Gross reported Hale had the right to file UCC financing statements and that the Convertible Promissory Note did not require GF Co., MacLeod, or Page to file financing statements. Gross further stated that because Hale did not file UCC financing statements, the assignee LLC would likely treat Hale's claim as unsecured. Finally, Gross stated that because GF Co. had terminated MacLeod and Hale as required by the assignment of all of its assets, their obligations to guarantee the Convertible Promissory Note were released pursuant to Section 7 of the Personal Guaranty.

On 12 August 2021, Hale filed suit against Page, MacLeod, and GF Co. On 3 September 2021, Hale requested details regarding the operations at GF Co., including how GF Co. had used the proceeds of Hale's $250,000.00 loan, the actual sales numbers for the fiscal years 2019-2021, and the details regarding why and how MacLeod and Page resigned their employment. In his complaint, Hale stated, upon information and belief, GF Co.'s assets were sold for substantially less than

$1,000,000.00. On 18 October 2021, MacLeod and GF Co. filed a motion to dismiss the complaint.

On 5 November 2021, Hale filed a First Amended Complaint (the "Amended Complaint") in which he alleged nine causes of action: (1) fraudulent inducement; (2) fraud, including representations and concealment; (3) breach of fiduciary duties; (4) constructive fraud; (5) breach of contract, including the covenant of good faith and fair dealing; (6) unfair and deceptive trade practices pursuant to N.C. Gen. Stat. § 75-1.1; (7) declaratory relief pursuant to N.C. Gen. Stat. § 1-253; and (8 and 9) in the alternative to the sixth cause of action, securities fraud and other violations of N.C. Gen. Stat. § 78A-56 under the North Carolina Securities Act.

On 1 December 2021, MacLeod and GF Co. renewed their motion to dismiss. On 7 December 2021, Page filed a motion to dismiss the Amended Complaint for failure to state a claim. On 22 August 2022, the trial court held a hearing on the motions to dismiss. On 29 August 2022, the trial court entered its order granting Page's motion to dismiss. On 8 September 2022, Hale voluntarily dismissed his complaint against MacLeod and GF Co. without prejudice. On 21 September 2022, Hale filed written notice of appeal of the trial court's order granting Page's motion to dismiss. All other facts are provided as necessary in our analysis.

## II. <u>Analysis</u>

**A. Standard of Review**

"This Court must conduct a *de novo* review of the pleadings to determine their legal sufficiency and to determine whether the trial court's ruling on the motion to dismiss was correct." *Leary v. N.C. Forest Prod., Inc.*, 157 N.C. App. 396, 400, 580 S.E.2d 1, 4 (2003). We view "the allegations as true and in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017) (ellipsis omitted). Rule 9 of our Rules of Civil Procedure requires that "[i]n all averments of fraud, duress or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." N.C. R. Civ. P. 9(b). Our Supreme Court elaborated on the Rule 9 particularity requirements, stating:

> The particularity required by the rule generally encompasses the time, place and contents of the fraudulent representation, the identity of the person making the representation and what was obtained by the fraudulent acts or representations. The particularity required cannot be satisfied by using conclusory language or asserting fraud through mere quotes from the statute.

*Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981).

"When reviewing pleadings with documentary attachments on a Rule 12(b)(6) motion, the actual content of the documents controls, not the allegations contained in the pleadings." *Schlieper v. Johnson*, 195 N.C. App. 257, 263, 672 S.E.2d 548, 552 (2009) (citing *Oberlin Capital, L.P. v. Slavin,* 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001) for the proposition that "contrary terms of loan agreement attached to the

- 12 -

complaint [are] controlling over allegations"). "The trial court can only consider facts properly pleaded and documents referred to or attached to the pleadings." *Builders Mut. Ins. Co. v. Glascarr Properties, Inc.*, 202 N.C. App. 323, 324, 688 S.E.2d 508, 510 (2010).

## B. Causes of Action 1 and 2: Fraudulent Inducement and Fraud

"A successful fraud claim requires a plaintiff prove: (1) representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party. The elements for showing fraudulent inducement are identical." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 263–64, 891 S.E.2d 100, 112 (2023) (citation and quotation marks omitted).

"It is generally held, and is the law in this State, that mere unfulfilled promises cannot be made the basis for an action of fraud." *Williams v. Williams*, 220 N.C. 806, 810, 18 S.E.2d 364, 366 (1942); *see also Value Health Sols., Inc.*, 385 N.C. at 276, 891 S.E.2d at 120 ("Failure to reach an agreement on the amendment of the milestones does not support a finding that PRA knew it was false at the time it represented that PRA would work towards an amendment") (citing *Williams*). "There must be evidence of a misrepresentation of existing or ascertainable facts, as distinguished from a matter of opinion or representation relating to future prospects." *Value Health Sols., Inc.*, 385 N.C. at 274–75, 891 S.E.2d at 119 (quotation marks omitted).

Here, because the elements for showing fraud and fraudulent inducement are identical, we consider the first and second causes of action together. Hale alleged in his complaint that Page made representations by providing information in the Note Package and Convertible Promissory Note regarding, at a minimum: (1) favorable market conditions on the hemp and CBD industries; (2) GF Co.'s ability to obtain financing and favorable business returns (including, for example, the representation that GF Co. had $100 million of deals in the "pipeline"); (3) Page's covenant to bring any and all disputes relating to the Convertible Promissory Note and Personal Guaranty in Buncombe County, North Carolina; (4) Page's implied promise that he would remain as an officer of GF Co. or did not specifically plan to utilize the "Release of Guaranty" clause to escape liability for his obligations under the Personal Guaranty; (5) Page's covenant to cause GF Co. to furnish quarterly financial statements; and (6) Hale would obtain status as a secured creditor through the efforts of GF Co. and/or Van Kirk as the Administrative Agent, specifically by filing a financing statement.

Hale's claims regarding venue, Page's alleged implied promise to remain employed as an officer of GF Co., Page's failure to furnish quarterly financial statements, and Page's failure to ensure Hale's security interest was perfected by filing a UCC financing statement assert claims regarding unfulfilled promises, not fraud. The claims constitute allegations that Page and/or MacLeod did not fulfill the terms of their agreements with Hale. Allegations that Page agreed to certain terms

and failed to comply with such terms do not constitute proper claims of fraud because fraud claims must be plead with specificity and require an adequately stated claim that one party has deceived another.  Therefore, we conclude Hale failed to state claims of fraudulent inducement or fraud based on obligations Page purported to undertake but failed to accomplish because these are claims regarding unfulfilled promises. *Value Health Sols., Inc.*, 385 N.C. at 275–76, 891 S.E.2d at 119–20.

We further conclude Hale has failed to adequately state claims of fraud in the pleadings regarding any of GF Co.'s prospective business performance.  Hale pleads:

> Defendants MacLeod and/or Page's conduct including representations prior to and [at] the time of signing the Convertible Note and thereafter, including failures to disclose material information regarding the state of the Hemp and CBD oil market at the time induced the Promissory Note, preclude Hale from discovering the financial condition of the company.

The documentation provided by Page to Hale contained extensive disclaimers throughout, including the Convertible Promissory Note's statements that the Holder could suffer a complete loss on an investment in the company and there "is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements."  We further note Rule 9 of the Rules of Civil Procedure requires a plaintiff to plead the "identity of the person making the representation" and that the "particularity required cannot be satisfied by using conclusory language or asserting fraud through mere quotes from the statute." *Terry*, 302 N.C. at 85, 273 S.E.2d at 678.  Here, Hale does not particularly identify who he

alleges fraudulently concealed information; rather, he alleges that "MacLeod and/or Page" failed to disclose information.

Most importantly, Hale alleges MacLeod and/or Page failed to disclose information in violation of their alleged contractual obligations to do so, which amounts to an unfulfilled promise rather than fraudulently concealing facts. Moreover, Hale does not particularly identify *what information* Page failed to provide and upon which Hale relied, in violation of Rule 9's particularity requirement.

Finally, Hale fails to demonstrate fraudulent inducement and fraud based solely on the facts Page and/or MacLeod are alleged to have claimed existed at the time, such as the purported $100 million in deals GF Co. had "in the pipeline." Significantly, Hale's complaint states that "The Personal Letter of Page includes representations *MacLeod intended Hale to rely on*, including without limitation: that GF Co. had $100 million in business in the 'pipeline today[.]' " (Emphasis added). During oral argument, Hale emphasized this "$100 million in the pipeline" representation as one of the key false statements of existing fact because it signaled the strong financial health of the company and in any event must have been false because GF Co. became insolvent less than a year later. Assuming arguendo that the statement was false, Hale alleges *MacLeod*, not Page, intended for him to rely upon the misrepresentation. Therefore, Hale fails to state a claim of fraudulent inducement or fraud by Page.

Because our appellate courts require claims of fraud to be based on particularly alleged existing facts, not merely on future prospects or unfulfilled promises, Hale fails to state claims of fraudulent inducement or fraud based on (1) any failure on Page's part to fulfill his obligations under the agreements between him and Hale; and (2) purported misrepresentations concerning GF Co.'s future financial performance. *Value Health Sols.*, 385 N.C. at 275–76, 891 S.E.2d at 119–20. Accordingly, we affirm the trial court's ruling as to these claims.

## C. Cause of Action 3: Breach of Fiduciary Duties

In his Amended Complaint, Hale alleges GF Co. and Page in his capacity as CEO breached their fiduciary duty to Hale as a secured creditor. The complaint specially alleges: "Upon information and belief, at some point in time during the time period described herein, GF Co. entered a Zone of Insolvency, which triggered heightened duties owed to GF Co.'s creditors," including Page's duties as the CEO to Hale as a secured creditor.

"A claim for breach of fiduciary duty requires the existence of a fiduciary relationship." *White v. Consol. Plan., Inc.*, 166 N.C. App. 283, 293, 603 S.E.2d 147, 155 (2004). This Court has defined a fiduciary relationship

> as one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence, and it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.

- 17 -

*Farndale Co., LLC v. Gibellini*, 176 N.C. App. 60, 67, 628 S.E.2d 15, 19 (2006) (brackets, and ellipsis omitted).

This court in *Gibellini* noted, "it is well established that a controlling shareholder owes a fiduciary duty to minority shareholders." *Id.* In contrast, "[a]s a general rule, directors of a corporation do not owe a fiduciary duty to creditors of the corporation." *Whitley v. Carolina Clinic, Inc.*, 118 N.C. App. 523, 526, 455 S.E.2d 896, 899 (1995). This Court provided further guidance in *Whitley*:

> [D]irectors of an insolvent corporation cannot as creditors of such corporation secure to themselves a preference. They must share ratably in the distribution of the company's assets. . . . [A]n insolvent corporation cannot in any way prefer the claims of its directors, officers or shareholders because they are not allowed to take advantage of their intimate knowledge of the corporate affairs or their position of trust to the detriment of other creditors."

*Id.* at 526, 455 S.E.2d at 899 (quoting Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 15.3, at 255 (4th ed. 1990)).

Whether Page owed a fiduciary duty to Hale depends on whether: (1) Page was a controlling shareholder or an officer of GF Co.; and, (2) Hale was a shareholder. Because Page was the CEO, he was an officer of GF Co. Moreover, Page was a shareholder of GF Co., owning a five percent (5%) interest in GF Co. and a co-trustee with MacLeod of Canyon Trust which owned fifty-seven and a half percent (57.5%) of

GF Co. through Canyon Trust.[2]   However, Hale was a creditor, not a shareholder. Clearly, the Convertible Promissory Note was convertible for a future percentage ownership interest in GF Co.; however, Hale does not contend that he executed his option to convert the Note into shares in the company.

Second, even if a duty were imposed upon Page toward Hale during GF Co.'s insolvency, such duty ceased once the Company transferred all of its assets to the Series LLC charged with the task of liquidating GF Co. and distributing the proceeds.

Finally, in the section titled "Conflicts of Interest & Other Matters," the Offering Memorandum states: "Fiduciary Duties[:] The Manager owes no fiduciary duties to the Company or to any members.  Officers of the Company only owe those fiduciary duties specifically set forth in an employment agreement between the Company and said officer, if any."  A careful review of the Record before us does not reveal the existence of a specific, contractual fiduciary duty imposed upon Page toward Hale because Page was not a controlling shareholder and Hale was not a shareholder.  *Schlieper*, 195 N.C. App. at 263, 672 S.E.2d at 552.  Hale's breach of fiduciary duty claim also fails.  Accordingly, we affirm the trial court's dismissal of Hale's claim for breach of fiduciary duty.

**D. Cause of Action 4: Constructive Fraud**

---

[2] While Page and MacLeod were co-trustees of the Canyon Trust, MacLeod was its sole beneficiary.

In *White*, this Court provided guidance regarding how to differentiate between stating a claim for breach of fiduciary duty versus stating a claim of constructive fraud:

> Although the elements of these causes of action overlap, each is a separate claim under North Carolina law. . . . To survive a motion to dismiss, a cause of action for constructive fraud must allege (1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured. Intent to deceive is not an element of constructive fraud. The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself.

*White*, 166 N.C. App. at 293–94, 603 S.E.2d at 155–56 (citations omitted).

If no fiduciary relationship exists, then no further analysis is required for a claim of constructive fraud. *See id.* at 294–95, 603 S.E.2d at 156 ("Since we have already found sufficient allegations of a fiduciary relationship, the controlling issue as to the constructive fraud claim is whether the complaint sufficiently alleges a wrongful benefit").

As no fiduciary relationship existed between Page and Hale, our analysis of constructive fraud ends. We hold Hale failed to state a claim of constructive fraud. We affirm the trial court's dismissal of Hale's claim of constructive fraud.

**E. Cause of Action 5: Breach of Contract**

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000).

"[T]he usual rule [is] that an officer of a corporation will not be individually bound when contracting within the scope of his employment as an agent of the corporation." *Howell v. Smith*, 261 N.C. 256, 260, 134 S.E.2d 381, 384 (1964). "When a corporate officer acts as an agent for the corporation and enters into a contract with a third party, providing notice that he is acting as the agent for the corporation, the corporate officer is not personally liable for corporation obligations arising from said contract." *Nutek Custom Hosiery, Inc. v. Roebuck*, 161 N.C. App. 166, 168, 587 S.E.2d 502, 504 (2003).

Hale's breach of contract claims pertain to the Convertible Promissory Note and Page's Personal Guaranty. His breach of contract claims arising out of the Convertible Promissory Note pertain to: (1) GF Co.'s purported obligation to file a financing statement to perfect Hale's security interest in GF Co.'s assets; and (2) the propriety or impropriety of GF Co.'s termination of all of its employees. GF Co. and Hale were parties to the Convertible Promissory Note. Although Page signed the note, he did so in his official capacity as CEO of GF Co. as is indicated by his title as CEO being recorded beneath his signature line. The signature page listed GF Co. as the party signing the contract, making Page an agent acting on behalf of a disclosed principal, and therefore, Page is not personally liable for GF Co.'s obligations unless

personally guaranteed. In other words, Page is not the proper party under the promissory note to pursue for such claims because he is neither liable as an officer of the company nor a party to the contract. *Schlieper*, 195 N.C. App. at 263, 672 S.E.2d at 552. Because under basic agency law, Page is not liable as an agent for obligations arising out of the Convertible Promissory Note, Hale's breach of contract claim under the promissory note fails.

Second, Hale alleges Page failed to bring an action in Buncombe County, North Carolina in accordance with Page's Personal Guaranty. To the contrary, Page argues that the language in Section 11 of the Personal Guaranty—stating that Page would bring "any action, litigation, or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, *against the Holder* [Hale], in any way relating to the Guaranty or the transactions contemplated hereby" only in Buncombe County or the U.S. District Court for the Western District of North Carolina—merely obligated Page to commence any legal action *against Hale* relating to the Guaranty in those venues. (Emphasis added). We agree. Although the language in the venue clause is broad, it did not prevent GF Co. from commencing the Michigan Liquidation because that legal proceeding was not an action *against Hale*.

We now address whether Hale successfully states a breach of contract claim as to Page's Personal Guaranty. The Personal Guaranty contains the same terms as those in the Convertible Promissory Note—that, commensurate with Page's five

percent (5%) ownership interest in GF Co., he would guarantee five percent (5%) of the "Guarantee Amount." The Convertible Promissory Note defined the Guarantee Amount as "the aggregate principal balance under this Note." Hale separately signed a document, the Personal Guaranty, in which he personally guaranteed to Hale "the amount of the Cap." The Cap was defined as five percent (5%) of "the outstanding aggregate principal balance due under the Note." Both the Convertible Promissory Note and Page's Personal Guaranty contained "release" provisions releasing Page from liability under the Personal Guaranty if he no longer owns any portion of GF Co. or if GF Co. were to terminate his employment with the company.

In Hale's breach of contract cause of action, he alleges Page "breached the terms of the . . . Guaranty Agreement[ ], including the covenants of good faith and fair dealing therein, by resigning from employment after assigning GF Co's assets to an unrelated party supposedly for the benefit of creditors." He further alleges he is entitled to specific performance of the terms of Page's Personal Guaranty.

Page argues, however, that because he was "terminated" from employment with GF Co., he was released from liability under the Personal Guaranty. In a letter written by Page's attorney, Gross states that "as a requirement of the assignment" of all GF Co.'s assets to the Series LLC responsible for liquidating them, "all Company employees were terminated, including Dr. MacLeod and Mr. Page." However, Hale alleges in his complaint that on 18 May 2021, MacLeod and Page called Hale to

inform him GF Co. was no longer viable, they were shutting down the business, "and that they *voluntarily resigned* from GF Co.'s management." (Emphasis added).

"A complaint should not be dismissed under Rule 12(b)(6) unless it affirmatively appears that plaintiff is entitled to no relief under any state of facts which could be presented in support of the claim." *Ladd v. Est. of Kellenberger*, 314 N.C. 477, 481, 334 S.E.2d 751, 755 (1985) (quotation marks and ellipsis omitted). Upon a motion to dismiss, the allegations contained in the complaint are taken as true. *Christenbury Eye Ctr., P.A.*, 370 N.C. at 5, 802 S.E.2d at 891. Nevertheless, documents attached to and incorporated in a complaint are controlling if they contradict the contents of the complaint. *See Schlieper*, 195 N.C. App. at 263, 672 S.E.2d at 552. For example, the court in *Schlieper* noted that if the terms of a contract attached to the complaint are contrary to the allegations contained in the complaint, the contract terms control. *Id.* (citing *Oberlin Capital,* 147 N.C. App. at 60, 554 S.E.2d at 847).

Here, Hale attached to his complaint a letter from Page's attorney to Hale's attorney representing that Page was terminated from employment with GF Co. This letter, prepared in anticipation of or during litigation, is not a controlling document like the contract in *Oberlin Capital*. The letter is not the subject of the dispute in this case; rather, the Personal Guaranty is the subject of dispute, and Hale alleges Page did not fulfill its terms. The letter from Page's attorney is relevant to the factual question of whether Page actually was terminated and therefore whether he was

released from the terms of the Personal Guaranty. However, we will not resolve a factual dispute at the pleading stage.

Taking Hale's allegations as true, we hold he has made sufficient allegations to withstand a Rule 12(b)(6) motion on his claim for breach of contract by alleging that Page did not uphold the terms of the Personal Guaranty when he failed to pay Hale five percent of the outstanding balance of the Note's value. Because Hale adequately stated a claim for breach of contract with respect to Page's Personal Guaranty, the trial court erred in dismissing the claim.

## F. Cause of Action 6: Unfair and Deceptive Trade Practices

In his opening brief, Hale fails to argue for reversal of the trial court's order dismissing his claim of unfair and deceptive trade practices pursuant to N.C. Gen. Stat. § 75-1.1 (the Unfair and Deceptive Trade Practices Act, or, the "Act") which prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). In his appellate brief, Hale offers only the following in support of this claim: "Hale alleges that he was fraudulently induced to loan money to GF Co. relying on promises that he would be considered a fully secured lender treated differently than ordinary equity holders and paid prior to investors in circumstances like those contained in the allegations."

Our Supreme Court recently stated, "actions solely connected to a company's capital fundraising are not 'in or affecting commerce,' even under a reasonably broad

interpretation of the legislative intent underlying these terms." *Nobel v. Foxmoor Grp.*, 380 N.C. 116, 120, 868 S.E.2d 30, 34 (2022). The court in *Nobel* held that a transaction involving a promissory note to raise capital for a newly formed company did not implicate "the regular purchase and sale of goods," but rather was only an investment "to provide and maintain adequate capital for the enterprise." *Id.* at 117–18, 120–21 868 S.E.2d at 32, 34 (quotation marks and brackets omitted). Similarly, Hale's loan to GF Co. was not "in or affecting commerce" within the meaning of the Act. *Id.* at 122, 868 S.E.2d at 34–35.

Regardless of whether Hale abandoned his unfair and deceptive trade practices claim, we hold the analysis in *Nobel* controls here because the Convertible Promissory Note concerned the raising of capital for GF Co. rather than the regular purchase and sale of goods, such as GF Co.'s business in hemp or CBD. Therefore, Hale fails to state a claim of unfair and deceptive trade practices, and we affirm the trial court's dismissal of that claim.

## G. Cause of Action 7: Declaratory Relief

Hale also seeks declaratory relief pursuant to N.C. Gen. Stat. § 1-253 and requests this court to declare the Michigan Liquidation "void *ab initio*" and for all legal proceedings to be conducted in North Carolina. N.C. R. App. P. 28 provides in pertinent part:

> The function of all briefs required or permitted by these rules is to define clearly the issues presented to the reviewing court and to present the arguments and

> authorities upon which the parties rely in support of their respective positions thereon. The scope of review on appeal is limited to issues so presented in the several briefs. Issues not presented and discussed in a party's brief are deemed abandoned.

N.C. R. App. P. 28(a). Hale fails to argue this issue in his brief and therefore is deemed to have abandoned this issue on appeal. Accordingly, the trial court's dismissal of Hale's claim for declaratory relief is affirmed.

**H. Causes of Action 8 and 9: Securities Fraud**

Hale next argues Page violated N.C. Gen. Stat. § 78A-56. Section (a) of the statute contains two antifraud provisions. N.C. Gen. Stat. § 78A-56(a)(1) provides a cause of action for violations of, among other provisions, sections 78A-8(1) and 78A-24. We address N.C. Gen. Stat. §§ 78A-8(1) and 78A-24 in turn.

First, N.C. Gen. Stat. § 78A-8(1) makes it "unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly . . . [t]o employ any device, scheme, or artifice to defraud." As an initial matter, we note that a plaintiff must actually allege he purchased a security to properly allege a violation of N.C. Gen. Stat. § 78A-8. This Court has held that where a defendant's counterclaim did not "allege the stock he purchased was a 'security,' " the defendant failed to state a claim for securities fraud. *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 41, 626 S.E.2d 315, 322 (2006). Here, Hale merely argues that to the extent "Page took the position that the Note Package, including the Guaranty is . . . a security under North Carolina Law," Page committed securities

fraud. However, there is nothing in the record to suggest either Page or MacLeod

represented to Hale that the Note Package was a security required to be registered.

The Note Package contained an "Offering Memorandum" which provided notices

regarding GF Co.'s "$10,000,000 OFFERING . . . FOR ACCREDITED INVESTORS

ONLY":

> These securities have not been registered with the Securities and Exchange Commission ("SEC"), or with any state securities commission or any other regulatory authority. The securities are being offered in reliance upon an exemption from the registration requirement of federal and state securities laws and cannot be resold unless they are subsequently registered under such laws or unless an exemption from registration is available.
>
> Neither the SEC nor any othe[r] agency has passed on, recommended, or endorsed the merits of this offering or the accuracy or adequacy of this memorandum. Any representations to the contrary is unlawful.
>
> An investment in this company involves significant risk.
>
> See "RISK FACTORS."

(Regular capitalization used for clarity of reading).[3] A section in the Offering

Memorandum titled "Investor Notices" states:

> [GF Co.] is a limited liability company . . . . No person other than the manager[4] of the company . . . has been authorized to make representations, or give any information, with respect to the company except the information and representations contained in this memorandum. Any

---

[3] We modify the capitalization throughout for ease of reading.
[4] The Offering Memorandum stated GF Co. is a manager-managed limited liability company managed by MacLeod.

further information given or representation made by any sales agent, broker, dealer, salesman, or other person must be regarded as unauthorized. . . .

Convertible promissory notes are available only to persons willing and able to bear the economic risks of this investment for an indefinite period of time. Convertible promissory notes are speculative securities, involve a high degree of risk, and are intended for sale to a limited number of experienced and accredited investors. . . .

This offering is expected to be conducted as an exempt securities offering. Specifically, convertible promissory notes are offered pursuant to an exemption from registration under Section 4(A)(2) of the Securities Act of 1933, as amended (the "Securities Act"), the applicable provisions of Rule 506(B) under Regulation D promulgated thereunder, and applicable state securities. . . . Convertible promissory notes have not been, and will not be, registered under the Securities Act, and have not been registered with, or approved by, any federal or state securities . . . administrator or any other regulatory authority. . . .

. . .

Notice to North Carolina Residents Only: These securities may be offered pursuant to a claim of exemption under the North Carolina Securities Act. The North Carolina Securities Administration[5] neither recommends nor endorses the purchase of any securities, nor has the administrator passed upon the accuracy or adequacy of the information provided herein. Any representation to the contrary is a criminal offense.

---

[5] There is no entity named North Carolina Securities Administration, so we presume this reference is to the North Carolina Secretary of State Securities Division.

Hale's "to the extent approach" simply fails to argue that the Convertible Promissory Note is a Security, not exempt from the provisions of N.C. Gen. Stat. § 78A-8. We will not attempt to construct a claim for him.

Second, under N.C. Gen. Stat. § 78A-24:

> It is unlawful for any person to offer or sell any security in this State unless (i) it is registered under this Chapter, (ii) the security or transaction is exempted under [N.C. Gen. Stat. §§] 78A-16 or 78A-17 and such exemption has not been denied or revoked under [N.C. Gen. Stat. §] 78A-18, or (iii) it is a security covered under federal law.

The Securities Act of 1933 generally requires issuers of security offerings to file a registration statement. 15 U.S.C. § 77d, f, g. However, 15 U.S.C. § 77d exempts "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2). Specifically, 17 C.F.R. § 230.506(b) (2021) provides a "safe harbor" for securities offered under 15 U.S.C. § 77d(a)(2) if the security offering complies with 17 C.F.R. §§ 230.501 (2020) and 230.502 (2021).[6] 17 C.F.R. § 230.501 (2020) provides a safe harbor to private securities offerings to accredited investors, including "any person . . . who

---

[6] 17 C.F.R. § 230.502 (2021) applies when "the issuer sells securities under § 230.506(b) to any purchaser that is not an accredited investor." 17 C.F.R. § 230.502(b)(1). Here, Hale represented and warranted to GF Co. that he is an accredited investor, and therefore, the requirement for the issuer to provide certain information does not apply. 17 C.F.R. § 230.502 (2021) also prohibits "general solicitation" and "general advertising" of security offerings and imposes limitations on resale. 17 C.F.R. § 230.502(c), (d) (2021). Here, there is no evidence in the Record nor allegation by Hale that GF Co. generally advertised Convertible Promissory Notes to the public. Moreover, the Offering Memorandum specifically states, "Convertible Promissory Notes cannot be sold, transferred, or pledged in the absence of registration under the Securities Act and the applicable state securities laws or the availability of an exemption therefrom. There is no public or other market for Convertible Promissory Notes, and no such market is expected to develop." Therefore, the Convertible Promissory Note complies with 17 C.F.R. § 230.502 (2021).

the issuer reasonably believes comes within any of the" enumerated categories in 17 C.F.R. § 230.501(a) (2020).  17 C.F.R. § 230.501(a) (2020).  Hale represented and warranted to GF Co. that he is an accredited investor.

Here, Hale argues that Page violated the Securities Act only to the extent that Page argues that the financial instrument at issue, the Convertible Promissory Note, is a security exempt from registration.  Specifically, Hale argues:

> The Note Package specifically includes the misrepresentation that the promissory note is not a security required to be registered in North Carolina. . . . GF Co's principal place of business and registered address was in North Carolina. As a result, Hale may also be entitled to recovery for misrepresentation and/or non-compliance with N.C. Gen. Stat. 78A-24 by offering and selling a security that was required to be, but was not, registered in North Carolina.

Hale does not allege any specific reasons why the Convertible Promissory Note constituted a security under N.C. Gen. Stat. § 78A-2 (state definition of security)[7] or

---

[7] N.C. Gen. Stat. § 78A-2 defines "security" as follows:

> "Security" means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract including without limitation any investment contract taking the form of a whiskey warehouse receipt or other investment of money in whiskey or malt beverages; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under a title or lease; viatical settlement contract or any fractional or pooled interest in a viatical settlement contract; or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt

15 U.S.C. § 77b (federal definition of security).[8]  Instead, Hale alleges in a merely conclusory manner that the "Convertible Note was not registered as a security as required by [N.C. Gen. Stat. §] 78A-24 and does not qualify for exemptions pursuant to [N.C. Gen. Stat. §§] 78A-16 . . . [or] 78A-17 from registration according to North Carolina laws."

It is true that North Carolina law generally requires registration of security offerings unless specifically exempted.  N.C. Gen. Stat. §§ 78A-16, 78A-17, 78A-24. Federal law specifically exempts from the "provisions of section 77(e)," or in other words, exempts from federal securities regulations, "transactions by an issuer not involving any public offering."  15 U.S.C. § 77d(a)(2).  State law also provides a similar private offering exemption for "[a]ny transaction pursuant to an offer directed by the offeror to not more than 25 persons . . . if the seller reasonably believes that all the buyers in this State are purchasing for investment."  N.C. Gen. Stat. § 78A-17(9).

Here, the Offering Memorandum explicitly states:

> This offering is expected to be conducted as an exempt
> securities offering.  Specifically, convertible promissory

---

for guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

N.C. Gen. Stat. § 78A-2(11).

[8] Federal law defines a security as one "designated as qualified for trading in the national market system pursuant to section 78k-1(a)(2) of this title that is listed, or authorized for listing, on a national securities exchange (or tier or segment thereof)."  15 U.S.C. § 77r(b)(1)(A).  15 U.S.C. § 78k-1(a)(2), in turn, directs the Securities and Exchange Commission to "designate the securities or classes of securities qualified for trading in the national market system from among securities other than exempted securities."

> notes are offered pursuant to an exemption from
> registration under Section 4(A)(2) of the Securities Act of
> 1933 [15 U.S.C. § 77d(a)(2)], as amended (the "Securities
> Act"), the applicable provisions of Rule 506(B) under
> Regulation D [17 C.F.R. § 230.506(b) (2021)] promulgated
> thereunder, and applicable state securities. Convertible
> promissory notes have not been, and will not be, registered
> under the Securities Act, and have not been registered
> with, or approved by, any federal or state securities . . .
> administrator or any other regulatory authority.

Therefore, GF Co. explicitly issued the Convertible Promissory Note as a private offering exempt under 15 U.S.C. § 77d(a)(2) from federal requirements for securities registration, and also exempt under State law pursuant to N.C. Gen. Stat. § 78A-17(9). Accordingly, Hale fails to state a claim under N.C. Gen. Stat. § 78A-24.

Third, the second antifraud provision of N.C. Gen. Stat. § 78A-56(a) imposes liability upon:

> [a]ny person who . . . [o]ffers or sells a security by means of
> any untrue statement of a material fact or any omission to
> state a material fact necessary in order to make the
> statements made, in the light of the circumstances under
> which they were made, not misleading (the purchaser not
> knowing of the untruth or omission), and who does not
> sustain the burden of proof that he did not know, and in
> the exercise of reasonable care could not have known, of the
> untruth or omission.

N.C. Gen. Stat. § 78A-56(a)(2). Regarding what constitutes a misrepresentation, this Court has stated:

> The tort of negligent misrepresentation occurs when a
> party justifiably relies to his detriment on information
> prepared without reasonable care by one who owed the
> relying party a duty of care. . . . [W]hen the party relying

- 33 -

> on the false or misleading representation could have
> discovered the truth upon inquiry, the complaint must
> allege that he was denied the opportunity to investigate or
> that he could not have learned the true facts by exercise of
> reasonable diligence.

*Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999).

Having addressed N.C. Gen. Stat. § 78A-56(a)(1), we now focus on N.C. Gen. Stat. § 78A-56(a)(2). Hale's complaint mentions N.C. Gen. Stat. § 78A-56(a)(2) only once:

> To the extent the Convertible Note is considered a security,
> both MacLeod and Page were offerors and/or sellers of the
> securities, and their conduct included soliciting Hale to
> purchase, offering to sell a security to Hale, and soliciting
> an offer to buy a security, using fraud, and/or (2) making
> materially false statements or omissions made in
> connection with an offer or sale of a security. Both MacLeod
> and Page are liable to Hale pursuant to N.C. Gen. Stat. §
> 78A-56(a), *including pursuant to section 78A-56(a)(2).*

(Emphasis added). Hale fails to identify a false statement of material fact or concealment of a material fact other than that MacLeod and Page falsely asserted the Convertible Promissory Note was exempt from securities registration requirements. Hale does allege that MacLeod and Page falsely stated that GF Co. obtained all authorizations or registration required by law. However, as explained above, we hold Page carried his burden in demonstrating the Convertible Promissory Note was not subject to registration as a security.

Moreover, Hale does not "allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Beemer*, 132 N.C. App. at 346, 511 S.E.2d at 313. Hale does not point to any attempt on his part to obtain further clarification—or any information at all—regarding the precise status of the Convertible Promissory Note. The Offering Memorandum explained the Convertible Promissory Note was not registered as a security and that GF Co. was relying on exemptions pursuant to 15 U.S.C. § 77d(a)(2) and 17 C.F.R. § 230.506(b) (2021). Therefore, Hale's claim under N.C. Gen. Stat. § 78A-56(a)(2) fails.

We note Hale would not have need to look far in the exercise of reasonable due diligence. The Note Package contained numerous disclaimers. The Offering Memorandum contained a "Risk Factors" section which stated:

> An investment in this company is speculative. Prospective investors are strongly advised to consider carefully the special risks involved in investing in the company. In addition to the other risks and conflicts of interest described elsewhere in this memorandum, prospective investors should consider the following risks which apply to the company before making a decision to invest. . . .
>
> We have a limited operating history upon which you may evaluate us. . . .
>
> Our success is dependent on our management and key personnel. . . . If any of our senior management, or any of our advisors, if any, were unable or unwilling to continue in their positions, our business and operations could be disrupted or fail.

Management has broad discretion as to the use of proceeds. . . .

Actual results of operations will vary from the Company's projections. . . .

Our business plan is unproven. . . .

The hemp industry is extremely speculative. . . .

We cannot ensure that we will earn a profit or that our product range will be accepted by consumers. . . .

Increased competition, competitive pressures, industry developments, and market conditions could affect the growth of business and adversely impact financial results. . . .

Notes are not guaranteed and could become worthless. The Notes are not guaranteed or insured by any government agency or by any private party. The amount of earnings is not guaranteed and can vary with market conditions. The return of all or any portion of capital invested in the Notes is not guaranteed, and the Notes could become worthless. . . .

The Notes are restricted securities and a market for such securities may never develop. . . . The Company has neither registered the Notes nor underlying securities, nor any other securities under the Securities Act. . . .

We may be required to register under the Securities Exchange Act.

The Note Package's slideshow also contained a "Disclaimers" page. "General" disclaimers stated:

The information provided in this presentation pertaining to [GF Co.], its business assets, strategy, and operations is for general informational purposes only and is not a formal

offer to sell or a solicitation of an offer to buy any securities, options, futures, or other derivatives relates to securities in any jurisdiction and its content is not prescribed by securities laws. Information contained in this presentation should not be relied upon as advice to buy or sell or hold such securities or as an offer to sell such securities. While the information in this presentation is believed to be accurate and reliable, [GF Co.] and its agents, advisors, directors, officers, employees and shareholders make no representations or warranties, expressed or implied, as to the accuracy of such information and [GF Co.] expressly disclaims any and all liability that may be based on such information or errors or omissions thereof. . . . Prospective investors should not construe the contents of this presentation as legal, tax, investment or other advice. All prospective investors should make their own inquiries and consult their own advisors as to legal, tax, investment, and related matters concerning an investment in the securities of the Company.

"Forward Looking Statement and Financial Projections" disclaimers stated:

Certain information in this presentation and oral statements made in any meetings are forward-looking and relate to [GF Co.] and its anticipated financial position, business strategy, events and courses of action. Forward-looking statements and financial projections . . . are subject to a variety of known and unknown risks and uncertainties . . . that could cause actual events or results to differ materially from those anticipated in the forward-looking statements and financial projections or could cause [them] to not occur at all. . . . [W]e cannot guarantee future results, level of activity, performance or achievements and there is no representation that the actual results achieved will be the same, in whole or in part, as those set out in the forward-looking statements and financial projections. Readers are cautioned to not place undue reliance on forward-looking statements or financial projections.

The Note Package further contained a "Cautionary Note Regarding Forward-Looking Statements" which stated:

> Statements contained in this Memorandum . . . discuss future expectations, and state other "forward looking" information. Those statements are subject to known and unknown risks, uncertainties and other factors, many of which are beyond the Company's control, which could cause the actual results to differ materially from those contemplated by the statements. . . . In light of the risks, assumptions, and uncertainties involved, no person, including the Company, can assure that the forward looking information contained in this Memorandum will in fact transpire or prove to be accurate.

As a signer of the Convertible Promissory Note, Hale specifically represented, warranted, and acknowledged:

> that investment in the Securities involves a high degree of risk, and represents that the Holder is able, without materially impairing the Holder's financial condition, to hold the Securities for an indefinite period of time *and to suffer a complete loss of the Holder's investment*."

(Emphasis added). This disclaimer constitutes a clear, specific notification to Hale that he could lose the entirety of his loan to GF Co. Any claims he now brings stating he reasonably relied upon information provided by Page painting GF Co.'s future business prospects in a positive light must fail given the clear disclaimers provided in the Convertible Promissory Note and elsewhere. "When reviewing pleadings with documentary attachments on a Rule 12(b)(6) motion, the actual content of the documents controls, not the allegations contained in the pleadings." *Schlieper*, 195 N.C. App. at 263, 672 S.E.2d at 552; *see also Builders Mut. Ins. Co.*, 202 N.C. App. at

324, 688 S.E.2d at 510 ("The trial court can only consider facts properly pleaded and documents referred to or attached to the pleadings."). Thus, we affirm the trial court's dismissal of Hale's claims of securities fraud.

## III. Conclusion

For the foregoing reasoning, we hold Hale fails to state a claim for: causes of action one and two, fraudulent inducement and fraud, because Page's representations involved unfulfilled promises or future business prospects rather than fraud; cause of action three, breach of fiduciary duties, because Page was not a controlling shareholder and Hale was not a shareholder; cause of action four, constructive fraud, because no fiduciary relationship existed between Page and Hale; cause of action six, unfair and deceptive trade practices, because the Convertible Promissory Note did not concern the regular purchase and sale of goods; cause of action seven, declaratory relief pursuant to N.C. Gen. Stat. § 1-253 because Hale did not address it in his brief; and causes of action eight and nine, securities fraud, because Hale does not support his contention that the Note Package was a security required to be registered and does not demonstrate he "justifiably relie[d] to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Beemer*, 132 N.C. App. at 346, 511 S.E.2d at 313.

We reverse the trial court's ruling as to Hale's fifth cause of action because we hold he states a claim for breach of contract as to Page's alleged failure to uphold the Personal Guaranty.

AFFIRMED IN PART AND REVERSED IN PART.

Judges TYSON and COLLINS concur.